511 So.2d 446 (1987)
Johnny Louis MILLER, et al,
v.
EAST BATON ROUGE PARISH SHERIFF'S DEPARTMENT, et al.
No. 86-C-1696.
Supreme Court of Louisiana.
July 28, 1987.
*448 Joseph Simpson, Simpson & Schwartz, Amite, for applicants.
William Cooper, Jr., Baton Rouge, for respondents.
DENNIS, Justice.
Our decision in this case hinges on whether more than one conclusion may reasonably be drawn as to whether a sheriff's department detective arrested and continued criminal proceedings against the plaintiffs without probable cause and with malice. After a bench trial, the district court found that the plaintiffs had fully proved malicious prosecution and awarded plaintiffs damages. On appeal, the court of appeal reversed, holding that the trial court erred manifestly in finding that the sheriff's detective had acted maliciously and without probable cause. Miller v. East Baton Rouge Parish Sheriff's Department, 492 So.2d 23 (La.App. 1st Cir.1986). We reverse, reinstate the district court judgment with respect to liability and remand the case to the court of appeal for its review of the damage awards. In this case more than one reasonable conclusion could have been drawn as to whether the detective acted without probable cause or with malice. Consequently, the court of appeal fell into error when it disturbed the trial court's reasonable findings on these issues and its judgment as to the defendant's liability for malicious prosecution.

1. Factual Background
A Baton Rouge television station broadcast on its "Crime Stoppers" program a reenactment of an unsolved armed robberyattempted murder which had occurred in East Baton Rouge Parish on November 12, 1982. The crime depicted in the program was one in which a man had been waylaid at night near Zachary, Louisiana as he entered the driveway to his rural home, beaten so severely that he nearly died and could not recall the identity of the culprit, and robbed of his wallet, truck and gun. A blue late model Ford pick-up truck had been seen in the vicinity before the offense by a witness who could not describe it more exactly because of darkness. Fingerprints and palm prints were taken from the victim's truck when it was found abandoned the day after the robbery in Slaughter, Louisiana. Viewers were invited to call a telephone number to give any information they might have concerning the offense. They were further informed that each caller would be assigned a code number to preserve his anonymity, and that information leading to arrest and conviction would entitle an informant to a reward.
In response to the program, an anonymous tipster identified the robbers as "Freddie Miller and his nephew." In due course, Lt. Cecil Jarreau, East Baton Rouge Sheriff's Detective, to whom the case had been assigned, was given the information as well as the circumstance under which it had been developed by Crime Stoppers. A few days later the tipster reported that Freddie Miller was in jail in Greensburg, Louisiana.
Lt. Jarreau went to the jail in Greensburg to interview Freddie Miller but found that he had been released on bail. However, the officer talked to another inmate, Eddie Joe Howell, who had been arrested for the same offense. Howell told him that he and Freddie Miller had been charged with the murder of Freddie Miller's nephew, Eldon O'Bryant, that Miller had been arrested first, but that he, Howell, had been arrested the next day because Miller "told them on me." When Howell was asked about Freddie Miller's involvement in any other crimes, Howell said that on or about November 17, 1982 at Miller's house in Amite, Miller asked him if he wanted to buy a gun and told him that a while back Freddie Miller and Johnny Miller waylaid a man coming into his driveway, beat him up badly, took his truck and wallet, and left him for dead. Howell also told Jarreau that Freddie used to commit crimes with Eldon O'Bryant, and that he, Howell, had *449 advised Eldon on how to rob people in the country:
I told himyou just way-lay them at the gate when they come inyou know that's why they always take their vehicleI told himI saidhow's it gonna lookyou jack some clown up and leave him in the ditch and their car is still there with the headlights on and all this kind of stuffany passerby will call the "heat"call the "man"where you get rid of it and go dump it down the road somewhere or take it home and strip it or sellor just get rid of itpeople driving down the road or passing a police car  there ain't nothing still out of the ordinary.
Howell said that in November, 1982 he saw Miller using his father's "old raggedy" blue green 1960's or early 70's one ton truck. Lt. Jarreau was not aware that Howell had access to television in jail and did not question him about whether he had learned of the crime facts from the Crime Stoppers program.
During the interview Howell disclosed to Lt. Jarreau some of the details of his extensive criminal record which included several felony convictions. At trial Lt. Jarreau testified that he had discussed Howell's criminal record with him and had looked at his rap sheet. Jarreau remembered that Howell had been convicted of bank robbery for which he had served a five year sentence but he could not recall the other offenses. Eddie Joe Howell's arrest and conviction record introduced at trial was extensive. It included charges of murder, conspiracy to commit murder, assault with a deadly weapon, forgery, receiving stolen property, possession of two driver's licenses, possession of stolen property and carrying a concealed weapon. His convictions and sentences included five years for bank robbery in California and eight years for bank robbery and conspiracy to possess contraband in Indiana. Nevertheless, Lt. Jarreau testified that even though he got the rap sheet and looked at it, that did not make any difference in his decision as to whether Howell was a credible informant, because most of his information as a detective comes from the criminal element.
Howell also informed the officer that he had received protection in the federal witness program in return for his testimony contributing to the conviction of an offender for murder committed in a federal penitentiary.
Lt. Jarreau the same day called Del Marie Howell, Eddie Joe Howell's wife, who lived in Amite, and interviewed her by telephone. Mrs. Howell had been charged with the murder of O'Bryant with her husband and Freddie Miller but was not in jail. She gave Lt. Jarreau information pertaining to Freddie and Johnny Miller based almost entirely on rumor, hearsay and alleged conversations with the Millers. She alleged generally that Freddie Miller had been involved in numerous crimes and said that he and others were responsible for service station robberies in Tangipahoa Parish and the dumping of an Orleans Parish murder victim's body in the lake. She had heard that Freddie committed these crimes with either Eldon O'Bryant or Johnny Miller, the latter, having become Miller's confederate after O'Bryant's death. However, she did not know anything about any East Baton Rouge Parish crimes in which Freddie may have been involved.
The detective sent Freddie Miller's fingerprints to the State Police for analysis but they reported that his prints did not match those on the victim's truck. Lt. Jarreau called Howell's federal probation officer and learned that he had received federal witness protection as he reported but that he had been discharged from the program because he did not continue to cooperate with the government. The Lieutenant called sheriffs' offices in surrounding parishes and determined that they had no record of an offense in November, 1982 similar to the one he was investigating. He also determined from the state motor vehicle bureau that Freddie Miller was the title holder of a 1970 Ford truck. He did not interview the witness who had seen a blue Ford truck in the vicinity the night of the crime or attempt to have the witness inspect Miller's truck because he thought darkness would have prevented the witness *450 from positively identifying the truck or any of its distinguishing features.
Lt. Jarreau obtained a warrant for the arrest of Freddie Miller on charges of attempted murder and armed robbery based on the officer's sworn affidavit setting forth the following facts: (1) the victim was severely beaten and was unable to recall anything about the crime; (2) a wallet,.357 magnum revolver, and a truck were taken from the victim in the robbery; (3) the victim's employee who left the store minutes before his employer saw a dark blue Ford pick-up, approximately a 1966 model, following him just before the time of the robbery; (4) after the employee and the truck passed the victim's residence, the truck turned and headed back toward that residence; (5) an anonymous tipster from the Crime Stoppers Program implicated Freddie Miller and said that Freddie Miller had been arrested for murder in Greensburg, Louisiana; (6) Freddie Miller had been in jail, but had been released on bond; (7) another man, Eddie Joe Howell, arrested with Freddie Miller for another crime, stated Freddie and his nephew had committed several robberies; (8) Freddie Miller asked Howell in November if he wanted to buy a gun. Freddie told Howell that he and Johnny had beaten a man, taken his wallet and truck and left the man for dead, but later found that he was still alive; (9) Howell said that Freddie owned a dark blue-green Ford pick-up either late 1960's or early 70's model; (10) no other similar incidents had occurred in surrounding parishes in November; (11) Howell was a federal witness in a murder case, his testimony resulted in a conviction, all of which was verified by Howell's federal parole officer.
Pursuant to the warrant, Lt. Jarreau arrested Freddie Miller on March 9, 1983 and placed him in the East Baton Rouge Parish Jail. On the same day, under authority of a search warrant, Jarreau searched Miller's mobile home for items connected with the crimes but found nothing. He also attempted to question Miller concerning the offense but ceased his effort when Miller said he had nothing to do with it and refused to answer further without counsel.
Freddie Miller and his father, Bobby Miller, testified that at the time of Freddie's arrest Lt. Jarreau refused to listen to the father's attempt to tell Jarreau that Freddie was at a party in Amite with over twenty people at the time of the crime in Zachary on November 12, 1982. Travis Dykes, former Chief Detective, Tangipahoa Sheriff's Department, an investigator employed by the Millers, testified that he offered Lt. Jarreau a list of alibi witnesses and urged him to check them out before he jailed Freddie in Baton Rouge but Jarreau refused saying he did not need to talk to these witnesses. Dykes further testified that he again unsuccessfully urged Lt. Jarreau to interview the potential defense witnesses at Freddie's bail hearing on March 11, 1983. At trial Lt. Jarreau testified that he did not remember these conversations. However, he admitted that as a general practice he refused to check out alibis because in his opinion criminals always have alibis.
At this point, Lt. Jarreau visited Mrs. Howell and conducted another interview. Mrs. Howell provided no new or more specific information concerning Freddie's and Johnny's alleged involvement in various burglaries and robberies. However, she stated in response to Lt. Jarreau's question that Freddie Miller had not associated with anyone named "Johnny" other than his cousin, Johnny Miller. She stated that she had seen Freddie Miller on unspecified occasions with a .357 magnum, a derringer, and a couple of rifles. She did not know anything about the November 12, 1982 crime. Freddie and Johnny began to discuss in her presence, a specific crime they had committed but they desisted at her request before she heard any of the details.
On March 15, 1983, Lt. Jarreau arrested Johnny Miller based on a warrant obtained with an affidavit identical to that of the officer's in Freddie Miller's arrest, except that he added these additional facts:
On Friday, March 11, 1983, the affiant interviewed and obtained a statement from Del Marie Howell, the wife of Eddie Howell. Mrs. Howell advised that she has lived all of life in Amite, Louisiana *451 and she had grown up with Freddie Miller along with his wife, Julie and Johnny Miller, Freddie Miller's cousin. She also stated that she knew Eldon O'Bryant, who was living with Freddie and Julie Miller before he was killed. Mrs. Howell further stated that Freddie Miller wanted Eldon O'Bryant killed because Freddie Miller was afraid that Eldon was going to talk to the police about all of the robberies and burglaries, which they had pulled together. Mrs. Howell further stated that Freddie Miller, Eldon O'Bryant and Johnny Miller had often bragged about the jobs, which they had pulled together, and that they had talked about them in the presence of her and her husband, Eddie Howell. Mrs. Howell further stated that she had seen Freddie Miller with a 357 caliber revolver and had also seen him with rifles and a derringer.
A drivers' license picture was shown to Mrs. Howell of a Johnny L. Miller, white male, date of birth 4/3/57, whom she positively identified as the Johnny Miller, whom she knew was Freddie Miller's cousin.
Unlike his cousin Freddie, Johnny Miller offered to cooperate fully and even showed Lt. Jarreau a letter from his attorney instructing him to do so. During the ride to the jail in Baton Rouge, Miller informed the detective that on the night of the crime, November 12, 1982, he attended a birthday and lasagna party in Amite and had spent the entire evening in the company of some twenty to twenty-four friends and family members. Further, he stated that Freddie Miller was also in attendance and that he could recall the date specifically because it was the birthday of his cousin's wife. On March 15, 1983, Johnny Miller's fingerprints and palm prints were compared to those taken from the victim's vehicle but no similarities were found.
Beginning on March 15, 1983, Travis Dykes asked Lt. Jarreau on several occasions to permit the Millers to take lie detector tests. Jarreau testified that he intended to offer them tests anyway but admitted that Dykes' requests brought them about a little faster. On March 22, 1983, a polygraphist selected by Jarreau and Dykes performed the tests and concluded that Johnny Miller had nothing to do with the November 12, 1982 crime. Further, in his opinion, Freddie Miller was not guilty of the crime itself but had not been completely truthful about his knowledge of the offense on his test.
Coincidentially, according to Lt. Jarreau, the Crime Stoppers tipster called him on March 22, 1983 and admitted that he had received his information about Freddie Miller from Eddie Joe Howell after they watched the Crime Stoppers television program together while they were fellow inmates at the St. Helena Parish Jail. Lt. Jarreau confronted Eddie Joe Howell with the tipster's admission but Howell denied watching or having any knowledge of the Crime Stoppers program. On March 24, 1983, Lt. Jarreau had a lie detector test performed on Howell from which the polygraphist concluded that Howell had lied about Freddie Miller's involvement in the November 12, 1982 crime. On that same day, the Lieutenant tricked Howell's wife into admitting that Howell had made up the whole story about the Miller's involvement in the Crime Stopper's case.
After spending eight days in jail, Johnny Miller was released on March 23, 1987 by order of a judge in response to a letter from Lt. Jarreau urging that charges be dismissed because the polygraph test indicated Miller's innocence and because of the evidence that Johnny was at a birthday party at the time of the crime. Freddie Miller was released on March 29, 1983, after spending twenty-one days in jail, in response to a letter of that date from Lt. Jarreau. In explanation of the five day delay between the Howell polygraph exculpating Freddie Miller and Lt. Jarreau's letter to the judge, the Lieutenant claimed that he had relied on an assistant district attorney to obtain Miller's release. When asked why he did not immediately write a letter directly to the judge when he learned of the decisive lie detector results, as he had done in Johnny Miller's case, Lt. Jarreau said he did not think it necessary *452 because the assistant district attorney assured him she would take care of it.
During the trial, there was evidence which tended to show that Lt. Jarreau arrested the Millers and continued proceedings against them although he knew that he did not have probable cause to incarcerate or prosecute them. According to Travis Dykes, on March 11, 1983, after attending Freddie Miller's bail hearing, he suggested that Lt. Jarreau should ask for a preliminary hearing in the case, but Jarreau replied that he did not have enough evidence at that time for a preliminary hearing. Lt. Jarreau conceded that he may have had a conversation with Dykes on that date but he did not recall discussing a preliminary hearing. However, the Lieutenant testified that his main object in arresting Freddie Miller was "to get him off of the street and see if he would talk to me." Further, he stated that "I was hoping someone would talk. I was hoping once I had Freddie in jail that somebody would open up...." As for Johnny Miller, Lt. Jarreau admitted that he did not have probable cause to arrest Johnny along with Freddie and that the only additional information he received about Johnny before arresting him was his second conversation with Howell's wife. The Lieutenant testified that after he arrested the Millers he thought one of them would eventually give him a statement or somebody they had talked to would come forward.

2. Trial and Appellate Courts
Freddie Miller and Johnny Miller filed suit for damages due to malicious prosecution against Lt. Jarreau, the East Baton Rouge Sheriff's Office and the American Druggist Insurance Company. After a trial before a judge, the court rendered judgment in favor of each plaintiff against the defendants in the sum of $50,700. In his reasons for judgment, the trial court found that there was not probable cause to arrest either of the plaintiffs and that there was actual malice on the part of Lt. Jarreau.
On appeal, the court of appeal reversed, deciding that the trial court had erred manifestly in finding that Lt. Jarreau acted without probable cause in arresting and continuing criminal proceedings against the plaintiffs.

3. Legal Precepts
An action for malicious prosecution in a criminal proceeding lies in all cases where there is a concurrence of the following elements: (1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damage conforming to legal standards resulting to plaintiff. Jones v. Soileau, 448 So.2d 1268 (La.1984); Hibernia Nat. Bank v. Bolleter, 390 So.2d 842 (La.1980); Johnson v. Pearce, 313 So.2d 812 (La.1975); Robinson v. Goudchaux's, 307 So.2d 287 (La.1975); Eusant v. Unity Industrial Life Ins., 195 La. 347, 196 So. 554 (1940).
The individual interest in freedom from unjustifiable litigation and the social interest in supporting a resort to law have traditionally been balanced by the requirement that the plaintiff must prove these essential elements to establish a malicious prosecution action against an accuser. Prosser & Keeton, The Law of Torts § 119 at p. 871 (5th ed. 1984); Harper, James and Gray, The Law of Torts § 4.2 at p. 407-408 (2nd ed. 1986); 54 C.J.S., Malicious Prosecution § 3 at p. 954-57 (1948).
Chief among these elements is the requirement that the plaintiff must sustain the burden of proof that the criminal proceeding was initiated or continued without "probable cause". Probable cause for arrest exists when facts and circumstances within the knowledge of the arresting officer and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Raheem, 464 So.2d 293 (La.1985); State v. Arceneaux, 425 So.2d 740 (La.1983); State v. Johnson, 422 So.2d 1125 (La.1982).
*453 The appearances must be such as to lead a reasonable person to set the criminal process in motion; unfounded suspicion and conjucture will not suffice. Prosser & Keeton, at p. 876. See Johnson v. Pearce, 313 So.2d 812 (La.1975); Whittington v. Gibson Discount, 296 So.2d 375 (La.App. 2d Cir.1974). Verification may be required to establish probable cause where the source of the information seems unworthy, or where further information about a serious charge would be readily available. Prosser & Keeton, at p. 877. See State v. Raheem, 464 So.2d 293 (La.1985). Cf. Plassan v. Louisiana Lottery Co., 34 La. Ann. 246 (1882). The reputation of the accused, his opportunity to offer explanation, and the need for prompt action, if any, are all factors in determining whether unverified information furnishes probable cause. Prosser & Keeton, at p. 877. See Hibernia Nat. Bank v. Bolleter, 390 So.2d 842 (La.1980); Jefferson v. S.S. Kresge Co., 344 So.2d 1118 (La.App. 3d Cir.1977); Hardin v. Barker's of Monroe, Inc., 336 So.2d 1031 (La.App. 2d Cir.1976).
Second of importance in actions of malicious prosecution is the element of defendant's malice. However, malice does not submit readily to definition. Green, Judge and Jury 347 (1930); Griswold v. Home, 19 Ariz. 56, 165 P. 318 (1917). See 54 C.J.S. Malicious Prosecution § 41 (1948); Sanders v. Daniel Intern. Corp., 682 S.W.2d 803 (Mo.1984). It means something more than the fictitious "malice in law" which has been developed in defamation cases as a cloak for strict liability. There must be malice in fact. Prosser & Keeton, at p. 882. Any feeling of hatred, animosity, or ill will toward the plaintiff, of course, amounts to malice. Harper, James and Gray § 4.6 at p. 443. See Barrios v. Yoars, 184 So. 212 (Orl.App.1938); Girot v. Graham, 41 La.Ann. 511, 6 So. 815 (1889). But it is not essential to prove such ill will. Malice is found when the defendant uses the prosecution for the purpose of obtaining any private advantage, for instance, as a means to extort money, to collect a debt, to recover property, to compel performance of a contract, to "tie up the mouths" of witnesses in another action, or as an experiment to discover who might have committed the crime. Prosser & Keeton, at p. 883; Harper, James and Gray, § 4.6 at p. 445 n. 8. See Jones v. Soileau, supra; Hibernia Nat. Bank v. Bolleter, supra; Johnson v. Ebberts, 11 F. 129 (C.C.Or.1880); Glover v. Fleming, 36 Md.App. 381, 373 A.2d 981 (1977). Malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights. Jones v. Soileau, supra; Hibernia Nat. Bank v. Bolleter, supra; Johnson v. Pearce, supra; Brown v. United States, 653 F.2d 196 (5th Cir.1981), cert. den. 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982). See Spencer v. Burglass, 337 So.2d 596 (La.App. 4th Cir.1976); Carter v. Catfish Cabin, 316 So.2d 517 (La.App. 2d Cir. 1975). Since the determination of malice in a malicious prosecution case is a question of fact, the issue is to be determined by the trier of fact unless only one conclusion may reasonably be drawn from the evidence. Prosser & Keeton, at p. 883 n. 74, 75; Green, at p. 347-48; Harper & James, and Gray, § 4.6 at p. 446-49. On appellate review such a finding is reversible only if manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Ryland v. Taylor, Porter, Brooks & Phillips, 496 So.2d 536 (La.App. 1st Cir.), cert. den. 497 So.2d 1388 (La.1986); Blackwell v. Blackwell, 479 So.2d 1085 (La.App. 3d Cir. 1985).

4. Application of Precepts
It is not disputed that the trial court correctly found that plaintiffs established the first three elements of their action for malicious prosecution. The elements contested here as in the court of appeal are malice and the absence of probable cause.

A. Probable Cause
Applying the appropriate legal precepts, we conclude that the trial court correctly determined that Lt. Jarreau acted without probable cause in arresting and continuing proceedings against each of the plaintiffs. Moreover, from our review of the record we conclude that the information casting *454 suspicion upon them deteriorated steadily so that there was at no time justification for their incarceration or prosecution.
Lt. Jarreau did not act as a man of average caution when he based his arrest and prosecution of the plaintiffs uncritically and almost exclusively on the word of Eddie Joe Howell, an incarcerated career criminal. Howell's lengthy criminal record of violence and dishonesty, as well as his admitted willingness to advise others in robbery, brutality and murder demonstrated that he was an unworthy source of information. Further, Lt. Jarreau was aware that Howell had reason to seek vengence against Freddie Miller because Miller had given a statement to the police accusing Howell of the murder which led to his incarceration. Additionally, the Lieutenant knew that the facts of the story that Howell used to dupe him had been broadcast over Crime Stoppers and were therefore well known. A reasonable person would not have set the criminal process in motion without obtaining more verification of Howell's information linking Miller to the crime than Lt. Jarreau was able to gather, particularly since the charges were extremely serious, further information was readily available, the plaintiff's reputations were relatively unblemished, and there was no need to arrest the plaintiffs before investigating further.
Lt. Jarreau's subsequent investigation did not provide sufficient reliable information to verify Howell's story and furnish a reasonable ground for belief in the guilt of the plaintiffs. His search of Freddie Miller's mobile home produced nothing. His efforts to match the plaintiffs' finger and palm prints with those found on the victim's truck failed completely. His attempt to place Freddie Miller's 1970 turquoise Ford pick-up truck near the victim's house about the time of the crime was equally unsuccessful. The vehicle sighted by a witness there had been described only as a late 1960's or early 1970's blue Ford pick-up, and the witness was unsure of the particulars and not confident in his description. Lt. Jarreau did not attempt to develop any additional information from this source. Without more, there were not enough common characteristics between the vehicles to conclude that it was likely that Miller's truck was the one seen by the witness. Lt. Jarreau's calls to other parishes may have eliminated the possibility that a similar crime had been committed there in November, 1982, but this information did not make it any more likely that the plaintiffs were involved in the offense under investigation. Further, his investigation of the unrelated crimes in which Howell and his wife attempted to implicate the plaintiffs did not lead to any concrete evidence. One of these crimes, an alleged Orleans Parish offense, apparently had never occurred. The Lieutenant apparently found little or no evidence to verify two alleged service station robberies in Tangipahoa Parish. With regard to the other alleged crimes, the Howells' information was so vague and indefinite that the crimes could not be identified with actual reported offenses. In only one instance, involving a crime in Ascension Parish, was Lt. Jarreau able to link Howell's story to a specific documented criminal offense. However, the facts of the Ascension Parish crime, as those of the East Baton Rouge offense under investigation, had been reenacted and widely disseminated on television by the "Crime Stoppers" program.
The information Del Marie Howell provided Lt. Jarreau did not reliably corroborate or verify her husband's report of Freddie Miller's inculpatory statement. First, Lt. Jarreau should have realized that she was no more of a trustworthy source of information than her husband. Freddie Miller's statement to the police apparently led to her being implicated and charged with murder along with her husband. She and her husband therefore had common interests in involving Miller in the East Baton Rouge Parish offenseto seek revenge and perhaps favor with the authorities. Lt. Jarreau was aware that she could have collaborated in a ruse because she communicated with her husband regularly even though he was in jail. Second, the information provided by Del Marie Howell could not be verified by independent trustworthy *455 sources any more than that supplied by Eddie Joe Howell. Mrs. Howell testified that she did not hear the details of a conversation between Freddie and Johnny Miller that may have concerned the crime under investigation. Her other accusations of them were apparently based on hearsay and could not be tied to any concrete reported offenses by Lt. Jarreau. On his second visit to Mrs. Howell she told him that Freddie Miller had not associated with anyone named "Johnny" other than Johnny Miller. This information did not add anything to what Lt. Jarreau already knew either in the way of bolstering her credibility as a trustworthy source or in verifying independently and reliably the facts incriminating the plaintiffs reported by Howell or his wife.
Lt. Jarreau's determination that Howell had received protection from the federal witness program did not boost his creditability so that he could have been considered a reliable source by a reasonable person. Lt. Jarreau also learned that Howell had been discharged from the program for lack of continued cooperation. Howell's receipt of a quid pro quo of identity and relocation protection in return for his testimony in a federal prison murder case does not necessarily indicate that he testified truthfully or that he would be truthful under other circumstances. When this ambiguous factor is weighed against Howell's documented record of crime, dishonesty and violence, as well as his motive for revenge, a person of average caution would not have considered his information creditable without further verification with reliable information.
There were additional factors, of which Lt. Jarreau was aware, that a reasonable person would have considered as weighing heavily against probable cause to arrest or proceed against the plaintiffs. The trial judge reasonably could have found that Lt. Jarreau was informed at the time of the initial arrest that both plaintiffs were at a birthday party with twenty someodd other persons on November 12, 1982. During the proceedings he was informed of this repeatedly by Johnny Miller, Johnny's father, Freddie Miller's father, and Travis Dykes, a former chief deputy of a neighboring parish. All of these persons, as well as the partygoers, were reputable citizens, and not all were related to the plaintiffs. The reputation of Johnny Miller was completely unblemished by either an arrest or a conviction. Compared with Eddie Joe Howell, Freddie Miller enjoyed a relatively clean reputation, since he had never been convicted and had been arrested only once, for the O'Bryant murder. Moreover, he was released on bail after giving a statement naming Howell as the murderer. From the record it appears that a diligent investigation by Lt. Jarreau even before Freddie Miller's arrest would have informed him that Howell was primarily responsible. In view of the seriousness of the charges, the absence of exigent circumstances, and the lack of corroboration available from independent sources, a reasonable person would have attempted to take statements and fingerprints from the plaintiffs before arresting or proceeding against them.

B. Malice
The trial court found that there was actual malice present in the actions of Lt. Jarreau against the plaintiffs. Additionally, the court found that the Lieutenant had been overzealous in his desire and haste to solve a notorious crime, that it was inconceivable that Lt. Jarreau, who was a 17 year veteran, could have been taken in by Howell's story, and that he had failed to make reasonable inquiries, both before and after the arrests, on information furnished by the Millers.
Although we do not think that the evidence supports a reasonable finding of hatred or ill will by Lt. Jarreau, the record fully supports a finding that he arrested the plaintiffs and set the criminal process in motion against them either knowing he lacked probable cause or in reckless disregard of their rights to be left alone in the absence of probable cause. Most telling in this regard was the Lieutenant's admission to Travis Dykes, which the trial court could reasonably credit, that he *456 did not have enough evidence to take the case through a preliminary examination. Since an unindicted defendant must be released at a preliminary examination if it appears there is not probable cause to charge him with the offense or with a lesser included offense, it reasonably may be inferred that Lt. Jarreau knew he did not have probable cause to charge the Millers. La.C.Cr.Pro. art. 296. Further, Lt. Jarreau admitted in his testimony that his main motive in arresting Freddie was to get him off the street, to lock him up and to force him or someone else to talk about the crime. His testimony also may be reasonably interpreted as indicating that his principal motive for arresting Johnny Miller was not based on probable cause but on his desire to obtain fingerprints and create more pressure for the Millers to confess or for other persons to come forward with evidence incriminating one or both of them. Based upon this and all of the evidence, we conclude that the trier of fact reasonably inferred malice from Lt. Jarreau's lack of probable cause and his reckless disregard of the plaintiff's rights.

5. Conclusion
Accordingly, we conclude that the court of appeal fell into error in reversing the trial court judgment; that the court of appeal judgment should be reversed; and that the case shall be remanded to the court of appeal for it to review the damage awards.[*]
REVERSED AND REMANDED TO COURT OF APPEAL FOR DAMAGE AWARDS REVIEW.
MARCUS, GULOTTA and LEMMON, JJ., dissent and assign reasons.
MARCUS, Justice (dissenting).
The court of appeal concluded that Lt. Jarreau acted in "good faith and reasonably believed" that the Millers were the perpetrators of the crime; therefore, the trial judge was clearly wrong in holding otherwise. I agree. While the presence of probable cause may be close under the circumstances, clearly there was no malice. Accordingly, I respectfully dissent.
GULOTTA,[*] Chief Judge, Court of Appeal, dissenting.
I respectfully dissent.
The underlying facts in this case, as set forth in the majority opinion, are not seriously in dispute. The question is whether these facts establish an absence of probable cause and the presence of malice.
In Jones v. Soileau, 448 So.2d 1268 (La. 1984), this Court stated that for probable cause to exist there must be "an honest and reasonable belief" in the guilt of the prosecuted party. Although it is clear from hindsight that the police investigation in the instant case was less than thorough and manifested a zealous desire to make an arrest, nonetheless, I cannot conclude that the officer acted unreasonably and in bad faith at the time he arrested plaintiffs.
Although the Court of Appeal concluded that the trial judge had manifestly erred, I view this case as turning on a question of sufficiency of evidence. In this regard, in my opinion, there is a lack of evidence to support a finding that the officer acted without probable cause and with malice.
Accordingly, I would affirm the judgment of the Court of Appeal.
*457 LEMMON, Justice, dissenting.
When the trial court, in an action for damages against a police officer, is called upon to determine whether the officer's presentation of a warrant application to a judicial officer constituted the tort of malicious prosecution, the appropriate standard is whether the application was so lacking in indicia of probable cause that no reasonable police officer would have believed that probable cause existed. If police officers of reasonable competence could have disagreed on the issue, there is no liability. See Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), which presented a similar issue in an action for damages under 42 U.S.C. § 1983 (1979).
A police officer who reasonably believes that there is probable cause for an arrest should be encouraged to submit an affidavit to a judicial officer. The weighing and judging of information contained in the application for an arrest warrant is virtually the exclusive province of the judicial officer, and a finding of probable cause by the judicial officer should be accorded great weight in determining liability in an action for damages against the police officer who presented the application. See Malley v. Briggs, supra, (Powell, J., concurring in part and dissenting in part).
Here, Lt. Jarreau presented to a judicial officer an affidavit which accurately stated the information that had been initially obtained from an anonymous tipster and had been subsequently developed in interviews with two other persons who had been arrested along with plaintiff Freddie Miller for an unrelated murder. That information included a statement by Freddie Miller that he and Johnny Miller had committed a crime similar in details and at a point close in time to the crime Lt. Jarreau was investigating, as well as the fact that a truck similar to the one owned by Miller was observed at the scene just before the crime. The judicial officer concluded from the affidavit that there was probable cause to arrest Miller.
On the evidence in the present record, considered in the light most favorable to the prevailing party in the trial court, but viewed along with the significant fact that the judicial officer approved the warrant, a rational trier of fact could not have concluded that the application was so lacking in indicia of probable cause that no reasonable police officer could have believed that probable cause existed.[1]
NOTES
[*] We disagree with the dissenting opinion filed by Justice Lemmon, and, as a precaution against any misunderstanding which may be created thereby, observe that: the dissenting opinion is based on federal law rather than Louisiana law applicable to this case; even under the federal case cited by the dissent, Jarreau could have been found guilty of a § 1983 violation because there was evidence from which a rational trier of the facts could have found that a reasonably well-trained officer in Jarreau's position would have known that he should not have applied for the warrant; the dissent fails to apply the Louisiana manifest error standard of appellate review of facts; the dissent disregards important factual distinctions between the separate claims of Freddie and Johnny Miller and ignores the continued malicious prosecution of each plaintiff after his arrest and in the face of mounting evidence of innocence.
[*] Gulotta, Chief Judge, Fourth Circuit Court of Appeal sitting in place of Cole, J. who is recused because he participated in the case in the court of appeal.
[1] Blame for continuation of the proceedings cannot be attributed to Lt. Jarreau. The primary protection offered by the judicial system against unwarranted arrest is the requirement of a finding of probable cause by a neutral magistrate. Once there has been an arrest based on probable cause, the primary protection against unwarranted continuance of incarceration is the preliminary examination, which plaintiffs failed to invoke.