899 So.2d 682 (2005)
Alfred KENNEDY, III
v.
SHERIFF OF EAST BATON ROUGE and Jack in the Box Eastern Division L.P. d/b/a Jack in the Box.
No. 2004 CA 0574.
Court of Appeal of Louisiana, First Circuit.
March 24, 2005.
Rehearing Denied May 11, 2005.
*684 Harley M. Brown, Baton Rouge, Counsel for Plaintiff/Appellant, Alfred Kennedy, III.
Stephen R. Wilson, Baton Rouge, Counsel for Defendant/Appellee, Jack In The Box, Inc.
Cyrus J. Greco, Leu Ann Greco, Megan Coogan Foco, Baton Rouge, Counsel for Defendant/Appellee, Sheriff Elmer B. Litchfield.
Before: WHIPPLE, DOWNING, and HUGHES, JJ.
HUGHES, J.
This is an appeal from a summary judgment dismissing the defendants in an action for false arrest and defamation. For the reasons that follow, we vacate the judgment and remand.

FACTS AND PROCEDURAL HISTORY
On December 7, 2001 Alfred Kennedy, III entered the drive-through lane of the Jack in the Box restaurant on Scenic Highway in Baton Rouge. Mr. Kennedy was a passenger in a vehicle with four female companions. After orders for food were placed, Mr. Kennedy tendered a one hundred dollar bill in payment of his order. The restaurant employee who received the bill suspected that it was counterfeit and notified local law enforcement personnel. While the Kennedy vehicle was in the drive-through, a deputy sheriff arrived and asked the driver to park her car. The deputy then questioned the occupants of the car and determined that Mr. Kennedy had tendered the bill in question. Mr. Kennedy was asked to exit the vehicle, whereupon he was taken by the deputy sheriff to a nearby sheriff's substation to await investigation of the authenticity of the bill by another deputy.
A counterfeit detection marker was obtained by the investigating deputy from a business near the Jack in the Box location and the bill was determined to be legitimate. The investigating deputy notified the substation that Mr. Kennedy was free to go and Mr. Kennedy's money was returned to him shortly thereafter.
On June 26, 2002 Mr. Kennedy filed the instant lawsuit to recover damages for false arrest against both the Sheriff of East Baton Rouge Parish ("Sheriff") and Jack in the Box, Inc. ("Jack").[1] After answers had been filed, the Sheriff filed a motion for summary judgment. Jack filed an exception of no cause of action, and in the alternative, a motion for summary judgment.
Following a hearing on December 8, 2003 the trial court granted both motions for summary judgment and denied Jack's exception. A judgment dismissing the Sheriff and Jack was signed on December 16, 2003. Mr. Kennedy has appealed this judgment. Jack filed an answer to this appeal seeking damages for frivolous appeal.

LAW AND ANALYSIS

Motion for Summary Judgment
The summary judgment procedure is designed to secure the just, speedy, and inexpensive *685 determination of every action, except those disallowed by LSA-C.C.P. art. 969; the procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966(A)(2). Summary judgment shall be rendered in favor of the mover if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Allen v. State ex rel. Ernest N. MorialNew Orleans Exhibition Hall Authority, XXXX-XXXX, p. 5 (La.4/9/03), 842 So.2d 373, 377; Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991). In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor. Hines v. Garrett, XXXX-XXXX, p. 1 (La.6/25/04), 876 So.2d 764, 765.
A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id. at 765-66.
The movant bears the burden to show there is no genuine issue of material fact. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. See Richard v. Hall, XXXX-XXXX, pp. 4-5 (La.4/23/04), 874 So.2d 131, 137; Dyess v. American National Property and Casualty Company, XXXX-XXXX, p. 4 (La.App. 1 Cir. 6/25/04), 886 So.2d 448, 451, writ denied, XXXX-XXXX (La.10/29/04), 885 So.2d 592; Cressionnie v. Intrepid, Inc., XXXX-XXXX, p. 3 (La.App. 1 Cir. 5/14/04), 879 So.2d 736, 738-39.

Allegations and Evidence Considered on Motion for Summary Judgment
Mr. Kennedy alleged in his petition that shortly after midnight on December 7, 2001 he and his companions went through a Jack in the Box drive-through in their automobile to purchase food. After confirming that the restaurant accepted one hundred dollar bills, Mr. Kennedy paid for his purchase with a 1974 series one hundred dollar bill. Mr. Kennedy alleged that while waiting in the drive-through lane for their food a Sheriff's deputy motioned for the vehicle in which he was riding to move out of the lane and park. After asking for identification, the deputy asked who paid with a one hundred dollar bill. When Mr. Kennedy identified himself as having tendered the bill, the deputy instructed him to get out of the vehicle, whereupon he was patted down, handcuffed, and informed that he was under arrest and would be taken to jail. Mr. Kennedy asserted that he was not allowed to ask any questions and was told to be quiet. Mr. Kennedy averred that during transport the officer asked him where he obtained the bill, and Mr. Kennedy told him that it was mailed to him by his great-grandmother who lived in New Orleans. Despite Mr. Kennedy's request that the deputy contact his great-grandmother to verify his story, this was not done. Mr. Kennedy further averred *686 that he remained in handcuffs during transport and while in the substation until the time he was released.
Mr. Kennedy alleged that at the time of the incident, he was a Southern University student "with a better than 2.8 GPA," was a junior deacon in his church, had been an Eagle Scout, was an honor student at his New Orleans high school, had never had any traffic violations, and had never been arrested or detained for any criminal activity. Because of the false arrest, Mr. Kennedy asserted that he had been deprived of his liberty, his meal, and had suffered humiliation, embarrassment, and mental anguish.
In support of the motions for summary judgment, the affidavits of Deputy Eric Jones and Lieutenant Richard Harris were filed into the record as well as an excerpt of the deposition of Alfred Kennedy, III.
Deputy Jones stated in his affidavit that on December 7, 2001 he accompanied Lieutenant Richard Harris to Jack in the Box in response to the complaint of a restaurant employee that a counterfeit one hundred dollar bill had been tendered for the purchase of food. The bill in question was presented to the deputies upon their arrival. It appeared suspicious to Deputy Jones because it was "short and dark in color and the size of Benjamin Franklin's head looked small." Deputy Jones asserted that the 1974 bill looked very different from modern-day one hundred dollar bills. Deputy Jones stated that he had knowledge at that time that counterfeit bills were being passed at other area businesses.
When Deputy Jones arrived, the Kennedy vehicle was still in the drive-through lane and was identified to the deputies. Deputy Jones directed the driver of the vehicle to pull into an empty parking space. Deputy Jones stated that he then informed the four females and one male occupant of the vehicle that he was investigating allegations that a counterfeit bill had been tendered by one of the vehicle's occupants; identification was then requested of the passengers. Deputy Jones stated that although at first Mr. Kennedy was evasive when questioned, he "finally" admitted to being the holder of the bill.
Deputy Jones further stated that the most efficient way to determine whether the bill was a counterfeit was to test it with a counterfeit detection marker that could be found at most convenience stores. While a marker was being sought Deputy Jones decided to transport Mr. Kennedy to the Scotlandville substation "to avoid the security risk of a crowd gathering around Mr. Kennedy and to protect him from a potentially embarrassing situation." Mr. Kennedy was handcuffed during transportation in the Sheriff's unit because it was Sheriff's office policy to do so.
Deputy Jones declared that "Mr. Kennedy was never placed under arrest" and that he informed Mr. Kennedy he was not under arrest and would be free to go "if" the bill was determined to be legitimate. The four ladies who were with Mr. Kennedy were allowed to follow them to the substation.
When Lieutenant Harris determined that the bill was not counterfeit, he radioed Deputy Jones at the substation with the information. Mr. Kennedy was informed that he could go then or wait for Lieutenant Harris to arrive with the bill. Lieutenant Harris stated that the one hundred dollar bill was returned to Mr. Kennedy after his having spent only ten to fifteen minutes at the substation and that the entire encounter lasted approximately forty minutes. In his affidavit Deputy Jones referred to the incident as a "detention" of Alfred Kennedy.
*687 Lieutenant Harris indicated in his affidavit that he was the supervisor of the Scotlandville Sheriff's substation and that he was also involved in the detention of Alfred Kennedy on December 7, 2001. Lieutenant Harris verified Deputy Jones's statements concerning the circumstances that led to their investigation of the one hundred dollar bill at issue. Lieutenant Harris also verified Deputy Jones's description of the unusual appearance of the bill.[2] Lieutenant Harris further confirmed the actions taken by Deputy Jones upon their arrival at the restaurant and the decision to transport Mr. Kennedy to the substation.
Lieutenant Harris explained that he went to two local convenience stores in search of a counterfeit detection marker before locating one at a Shell station at Plank Road and Harding Boulevard. Lieutenant Harris further stated that when he discovered the bill was genuine he radioed Deputy Jones of the fact and then returned to the substation to restore the bill to Mr. Kennedy, who departed after having spent ten to fifteen minutes there. Lieutenant Harris verified that the entire encounter lasted only about forty minutes and that the purpose of the detention was not to arrest Mr. Kennedy but to ascertain whether the bill was counterfeit.
The testimony of Alfred Kennedy, III was submitted to the trial court via a deposition excerpt and an affidavit. Mr. Kennedy asserted in his affidavit that after the deputies pulled over the car in which he was riding, he was "patted down, handcuffed, and informed that he was under arrest." Mr. Kennedy denied that the deputies explained to the occupants of the vehicle that they were investigating an allegation of a counterfeit bill being passed from their vehicle. It was not until after the occupants of the car had been asked for identification and Mr. Kennedy had been removed from the car and instructed to place his hands on the vehicle that the deputy asked who had tendered the one hundred dollar bill. Mr. Kennedy asserted that he admitted right away that he had paid with the bill and denied that he had been evasive. Mr. Kennedy further stated that he was arrested, read his rights, and handcuffed.
In the deposition excerpt of Mr. Kennedy, he testified that while being transported to the substation by Deputy Jones, the deputy explained that the bill was going to be tested using a counterfeit detection marker. The deputy informed Mr. Kennedy that if the bill proved to be genuine, he would be released, otherwise he would be facing Federal charges and lengthy jail time. Mr. Kennedy testified that upon his arrival at the substation, he was placed in a room with a different deputy, and that he was handcuffed the entire time.
The Sheriff's responses to interrogatories submitted by Plaintiff were also filed into the record. In response to Plaintiff's inquiry regarding the type of training and/or instruction the Sheriff's deputies had received in detection of counterfeit currency, the Sheriff replied that "[n]o formal training or instruction" had been given.

Actions for False Arrest and Defamation
During the instant litigation, Mr. Kennedy has asserted entitlement to a remedy for false arrest and, with respect to Jack, defamation.
The tort of false imprisonment or false arrest consists of the following two essential elements: (1) detention of the person, and (2) the unlawfulness of the detention. False imprisonment or arrest occurs when one arrests and restrains *688 another against his will without warrant or other statutory authority. Harris v. Eckerd Corp., 35,135, pp. 4-5 (La.App. 2 Cir. 9/26/01), 796 So.2d 719, 722. A peace officer may arrest a person without a warrant when the peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer. LSA-C.Cr.P. art. 213.
Reasonable cause has been judicially recognized as equivalent to probable cause. Although more than mere suspicion is needed, the measure of probable cause to arrest does not require that a police officer have proof sufficient to convict. Harris v. Eckerd Corp., 35,135 at p. 5, 796 So.2d at 723. Probable cause or reasonable cause for arrest as required by LSA-C.Cr.P. art. 213(3) exists when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information, are sufficient to justify an average man of caution in the belief that an offense has been committed. See Wolfe v. Wiener Enterprises, Inc., 94-2409, p. 3 (La.1/13/95), 648 So.2d 1293, 1295; Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d 446, 452 (La.1987); Harris v. Eckerd Corp., 35,135 at pp. 5-6, 796 So.2d at 723. The appearances must be such as to lead a reasonable person to set the criminal process in motion; unfounded suspicion and conjecture will not suffice. Verification may be required to establish probable cause where the source of the information seems unworthy, or where further information about a serious charge would be readily available. The reputation of the accused, his opportunity to offer explanation, and the need for prompt action, if any, are all factors in determining whether unverified information furnishes probable cause. Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d at 453.
Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. The fault requirement is often set forth in the jurisprudence as malice, actual or implied. Thus, in order to prevail on a defamation claim, a plaintiff must prove that the defendant, with malice or other fault, published a false statement with defamatory words which caused plaintiff damages. Costello v. Hardy, XXXX-XXXX, p. 12 (La.1/21/04), 864 So.2d 129, 139-140. Malice or other fault is established where a defendant has acted with a reckless disregard for the truth. See Johnson v. KTBS, Inc., 39,022, p. 7 (La.App. 2 Cir. 11/23/04), 889 So.2d 329, 333.[3]
*689 Entitlement to summary judgment in the instant case turns on the issues of whether there was a reasonable cause for detaining Mr. Kennedy, and whether there was fault on the part of Jack in summoning the police.
After a thorough review of the evidence presented on these motions for summary judgment, it appears that questions of fact remain as to whether the defendants took action to set a criminal investigation in motion on the basis of unfounded suspicion and conjecture. The type of reasonable and trustworthy information sufficient to justify a man of average caution in the belief that a person has tendered a counterfeit bill would seem to require some knowledge or training in the detection of counterfeit bills to constitute probable cause. There was no showing by either defendant that its employees were provided with instruction, training, or procedures to address suspicions of counterfeit money. There was no explanation as to why counterfeit detection markers, which were admittedly readily available at local convenience stores, were not available to the defendants' employees.
We conclude as a matter of law that defendants failed to show that they acted reasonably or without a reckless disregard for Mr. Kennedy's rights when a criminal investigation was instituted because the bill he presented merely looked unusual. "Old" currency is still legal tender of the United States. Citizens should not be at risk for spending legal tender. No evidence was offered on the motions for summary judgment to show that defendants' employees possessed any knowledge of identifiable valid criteria with which the bill in question was compared.
Consequently, we find the trial court erred in granting summary judgment and dismissing the defendants in this matter. Having found this appeal has merit, we find it unnecessary to address the claim of appellee Jack for frivolous appeal damages.

CONCLUSION
For the reasons assigned, we vacate the summary judgment in favor of defendants and remand the matter for further proceedings. All costs of this appeal are to be borne equally by defendants, the Sheriff of East Baton Rouge Parish and Jack in the Box, Inc.
JUDGMENT VACATED; ANSWER TO APPEAL DENIED; REMANDED.
NOTES
[1] Although Plaintiff named as a defendant "Jack in the Box Eastern Division L.P. d/b/a Jack in the Box Restaurant," the answer of this defendant was filed in the name of "Jack in the Box, Inc."
[2] The ages of Deputies Harris and Jones were not disclosed in their affidavits.
[3] Privilege is a defense to a defamation action. A qualified privilege exists whenever a defamatory communication is made: (1) in good faith, (2) on a matter in which the person making the communication has an interest or with regard to which he has a duty, or (3) to a person with a corresponding interest or duty. Good faith exists for the purpose of this privilege when the communicating party has reasonable grounds to believe the statement to be true. With respect to statements made to law enforcement officials in the course of an investigation of criminal activity, the privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate. The public has an interest in possible criminal activity being brought to the attention of the proper authorities, and remarks made in good faith setting forth well-founded charges are clearly privileged. Simon v. Variety Wholesalers, Inc., XXXX-XXXX, p. 6 (La.App. 1 Cir. 5/11/01), 788 So.2d 544, 549, writ denied, 2001-2371 (La.11/16/01), 802 So.2d 617. In cases involving statements made with regard to a matter of public concern, the plaintiff must prove actual malice, which means that the defendant either knew the statement was false or acted with reckless disregard for the truth. Johnson v. KTBS, Inc., 39,022 at p. 7, 889 So.2d at 333.