935 So.2d 669 (2006)
Alfred KENNEDY, III
v.
SHERIFF OF EAST BATON ROUGE and Jack in the Box Eastern Division L.P. d/b/a Jack in the Box.
No. 2005-C-1418.
Supreme Court of Louisiana.
July 10, 2006.
Rehearing Denied September 1, 2006.
*672 Keogh, Cox & Wilson, Stephen R. Wilson, Baton Rouge, for applicant.
Harley M. Brown, Baton Rouge; Taylor, Porter, Brooks & Phillips, Harry J. Phillips, Jr., John A. Viator, Cyrus J. Greco, Megan C. Foco, Baton Rouge, for respondent.
*673 WEIMER, Justice.
This case arises out of a claim for defamation brought by a private individual against a fast food restaurant. The allegedly defamatory statements were made by employees of the restaurant when they contacted police to report that an occupant in a vehicle in the drive-through lane of the restaurant had attempted to buy food with a counterfeit one hundred dollar bill. The district court granted summary judgment in favor of the restaurant, but the court of appeal reversed. We granted certiorari primarily to consider whether a private individual is entitled to a conditional or qualified privilege when the individual reports suspected criminal activity to the police, and if so, whether the privilege was abused in this case. Finding that the report to police of suspected criminal activity was conditionally privileged, and that the plaintiff failed to submit evidence sufficient to demonstrate that he will be able to meet his burden of proof at trial that the privilege was abused, we reverse the judgment of the court of appeal and reinstate the summary judgment in favor of the restaurant.

FACTS AND PROCEDURAL HISTORY
Shortly after midnight on December 7, 2001, Alfred Kennedy, III, accompanied by four female companions, entered the drive-through lane of a Jack in the Box restaurant in Baton Rouge, Louisiana. After confirming with the attendant on duty that the restaurant would accept one hundred dollar bills, the party placed an order for food and drinks. Kennedy tendered a 1974 series one hundred dollar bill in payment of the order. Suspecting the bill was counterfeit, the restaurant employee who received the bill notified local law enforcement. East Baton Rouge Parish sheriff's deputies arrived on the scene in minutes. Upon examining the bill and determining that it looked "suspicious," one of the deputies approached the vehicle, which was still in the drive-through lane, and motioned for the driver to move her car from the line. After the car was parked, and identification obtained from each of the occupants, the deputies proceeded to ascertain who in the vehicle had tendered the one hundred dollar bill. When Kennedy identified himself as the owner of the currency, he was asked to exit the car, whereupon he was handcuffed and transported to a nearby sheriff's substation to await investigation into the bill's authenticity.
While Kennedy waited at the substation, one of the deputies obtained a counterfeit detection marker from a nearby business. The bill was ultimately determined to be legitimate, and Kennedy was released and his money returned.
On June 26, 2002, Kennedy filed suit against both the Sheriff of East Baton Rouge Parish ("Sheriff") and Jack in the Box[1] seeking damages. Answers were filed by both defendants, following which the Sheriff moved for summary judgment. Jack in the Box filed an exception of no cause of action, and alternative motion for summary judgment. The matter was heard on December 8, 2003. At the conclusion of the hearing, the district court denied Jack in the Box's exception of no cause of action, but granted both motions for summary judgment. With respect to the claims against the Sheriff, the district court ruled that the deputies had probable cause to effect an arrest of Kennedy. As *674 to the claims against Jack in the Box, the court found no evidence to indicate that Jack in the Box or any of its employees detained Kennedy, and thus no evidence sufficient to support a claim for wrongful arrest. In addition, the court found that "[t]he record is also void of any showing of malice to support any kind of claim for defamation." A judgment dismissing the claims against the Sheriff and Jack in the Box was signed by the district court on December 16, 2003.
Kennedy appealed the adverse judgment. Jack in the Box answered the appeal seeking damages for frivolous appeal. On March 24, 2005, the Court of Appeal, First Circuit, handed down its opinion in this matter. Kennedy v. Sheriff of East Baton Rouge, 04-0574 (La.App. 1 Cir. 3/24/05), 899 So.2d 682. After conducting a de novo review of the materials submitted in connection with the summary judgment motions, the court of appeal concluded as a matter of law that the "defendants failed to show that they acted reasonably or without a reckless disregard for Mr. Kennedy's rights when a criminal investigation was instituted because the bill he presented merely looked unusual." Kennedy, 04-0574 at 11, 899 So.2d at 689. The court found that defendants failed to offer any evidence to indicate that their employees received any training or possessed any specialized knowledge with respect to identifying counterfeit currency, thereby raising factual questions as to the reasonableness of their conduct. Accordingly, the court of appeal vacated the district court judgment granting summary judgment in favor of defendants and remanded the matter for further proceedings.
Upon Jack in the Box's application,[2] we granted certiorari primarily to address the defamation claim, and more particularly, whether Jack in the Box's employees enjoyed a qualified privilege in reporting suspected criminal activity to law enforcement officials; and if so, whether sufficient evidence was offered of an abuse of the privilege to defeat Jack in the Box's motion for summary judgment. Kennedy v. Sheriff of East Baton Rouge, 05-1418 (La.1/13/06), 920 So.2d 217.

LAW AND DISCUSSION
We most recently addressed the tort of defamation in Costello v. Hardy, 03-1146 (La.1/21/04), 864 So.2d 129. Therein, we noted that defamation is a tort involving the invasion of a person's interest in his or her reputation and good name. Costello, 03-1146 at 12, 864 So.2d at 139. Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Id., quoting Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; RESTATEMENT (SECOND) OF TORTS § 558 (1977). The fault requirement is generally referred to in the jurisprudence as malice, actual or implied. Costello, 03-1146 at 12, 864 So.2d at 139.
By definition, a statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule. Costello, 03-1146 at 13, 864 So.2d at 140; Trentecosta, 96-2388 at 10, 703 So.2d at 559 (citing RESTATEMENT (SECOND) OF TORTS § 559 cmt. e (1977)). In Louisiana, defamatory words *675 have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Costello, 03-1146 at 13, 864 So.2d at 140; Madison v. Bolton, 234 La. 997, 102 So.2d 433, 438 (La.1958). Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. Costello, 03-1146 at 13-14, 864 So.2d at 140; Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196, 198 (La.1980). When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Costello, 03-1146 at 14, 864 So.2d at 140. Injury may also be presumed. Id. When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault) and injury. Id.
In the instant case, plaintiff's petition alleges that "Jack in the Box employee(s) made the false allegation to law enforcement officers that the plaintiff had passed counterfeit or unlawful tender at its restaurant." Such an allegation could be construed as Jack in the Box employees falsely accusing the plaintiff of the crime of monetary instrument abuse, LSA-R.S. 14:72.2. Under Louisiana's traditional defamation rules, such a statement would be considered defamatory per se, and the elements of falsity and malice (or fault) would, as a result, be presumed, shifting the burden of proof to defendant to rebut the adverse presumption.

Constitutional Requirements
Since the seminal decision of the United States Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the tort of defamation has been subject to the constraints of the First Amendment to the Constitution and its prohibition against any law abridging freedom of speech or of the press. In New York Times, the Supreme Court held that the First Amendment prohibits a public official from recovering damages arising from a defamatory falsehood published in relation to his or her official conduct unless the public official proves that statement was made with "actual malice"  that is, with knowledge that it was false or with reckless disregard of whether it was false or not. New York Times, 376 U.S. at 279-280, 84 S.Ct. at 726. The Supreme Court granted the protection to speech concerning public officials because of its perception that the common law rules of defamation, which imposed strict liability on the publisher of a defamatory statement that later proved to be false, regardless of whether the publisher had exercised due care to check the accuracy of the statement and reasonably believed it to be true, would have a chilling effect on constitutionally valuable speech. Id., 376 U.S. at 277-80, 84 S.Ct. at 723-725.[3] Thus, the New York Times decision not only imposed the requirement of a high degree of fault in defamation actions brought by public officials, but also shifted the burden of proof of fault to the public official and imposed a heightened burden. Trentecosta, 96-2388 at 12, 703 So.2d at 560.
In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), this constitutional protection *676 was subsequently extended to "public figures"[4] when the defamatory statements related to issues of public concern, and in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), to all "communication involving matters of public or general concern without regard to whether the persons involved are famous or anonymous." Id., 403 U.S. at 44, 91 S.Ct. at 1820.
Rosenbloom, a plurality opinion, marked the farthest extension of the free speech protections of the First Amendment to defamation law. However, the decision was not without its detractors, as the dissenting justices in Rosenbloom expressed concern that the holding of the case would unfairly abridge the rights of private individuals to protect their reputations. The tensions between those competing interests came fully to light in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
Gertz involved a private individual suing a media defendant for defamation on an issue of public concern. The Supreme Court recognized that a state's interest in compensating injury to the reputation of individuals is greater in the case of private individuals than for public officials and public figures, because private individuals characteristically have less access to channels of effective communication to counteract false statements than do public officials and public figures. Additionally, private individuals have not, by placing themselves in the public eye, voluntarily exposed themselves to increased risk of injury from defamatory falsehoods. The Supreme Court held that a private plaintiff need not prove "actual malice" under New York Times in order to recover actual damages in a defamation action. Rather, the Supreme Court in Gertz left to the states the freedom to establish their own standards of liability for a publisher or broadcaster of a defamatory falsehood injurious to a private individual, so long as the states do not impose liability without fault. Gertz, 418 U.S. at 344-347, 94 S.Ct. at 3009-3010.
In Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Supreme Court expanded its decision in Gertz by holding that the First Amendment requires placement of the burden of proving falsity, as well as fault, on the plaintiff in a defamation action by a private individual against a media defendant on a matter of public concern.[5]
*677 Rosenbloom, Gertz, and Philadelphia Newspapers represent a series of decisions in which the Supreme Court attempted to define the reach of the First Amendment to defamation actions, like the one before us, brought by private individuals. The legacy of these cases is that, while the states remain free to establish their own standards of liability for a publisher of defamatory falsehoods injurious to a private individual, the protections afforded by the First Amendment supercede the common law presumptions of fault, falsity, and damages with respect to speech involving matters of public concern, at least insofar as media defendants are concerned.
The instant case involves a private, non-public figure plaintiff (a college student attempting to purchase food at a local restaurant) and speech of public concern: the report to law enforcement officers of suspected criminal activity involving the distribution of counterfeit currency in the community.[6] The defendant, however, is a private, non-media entity. Whether First Amendment restraints supercede the presumptions of falsity, malice (or fault), and injury that would ordinarily obtain under Louisiana law when a statement is defamatory per se depends upon whether the constitutional protections extended to media defendants in Gertz and Philadelphia Newspapers obtain where the defendant is a private, non-media defendant, a question the Supreme Court has not squarely answered.[7] It is therefore left to this court to determine whether the principles enunciated by the Supreme Court in Gertz and Philadelphia Newspapers should logically extend to include non-media defendants, and whether, in any event, this court should so hold as a matter of state law.
In resolving this issue, the history of the New York Times decision provides an instructive analogy. Although that case arose in a media context, the holding contained no caveat restricting its application to media defendants. Rather, the opinion stated it applied to "critics of . . . official conduct." New York Times, 376 U.S. at 256, 84 S.Ct. at 713. Subsequent cases from the Supreme Court applied New York Times to non-media defendants. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Louisiana courts have followed a similar course, applying New York Times to non-media defendants. Davis v. Borsky, 94-2399 (La.9/5/95), 660 *678 So.2d 17; Landry v. Roberson Advertising Service, Inc., 95-0095, p. 6 (La.App. 4 Cir. 8/23/95), 660 So.2d 194, 197; Wattigny v. Lambert, 453 So.2d 1272, 1276 (La.App. 3 Cir.1984). On principle, there appears to be no reason to distinguish between media and non-media defendants in this regard. Issues of public concern regarding public officials and public figures may equally be discussed in media and non-media contexts, and the need for a constitutional privilege to protect "uninhibited, robust, and wide-open"[8] debate obtains in either case. See, RESTATEMENT (SECOND) OF TORTS § 580A cmt. h.
A review of the opinion in Gertz indicates that the restrictions imposed in that case were likewise made to protect "the vigorous exercise of First Amendment freedoms." Gertz, 418 U.S. at 349, 94 S.Ct. at 3012. Those freedoms include the exercise of free speech as well as the right to freedom of the press. We find that a private individual's right to free speech is no less valuable than that of a publisher, broadcaster or other member of the communications media and therefore should be protected by similar standards of proof. As aptly explained in the RESTATEMENT (SECOND) OF TORTS § 580B cmt. e:
[T]he principle of the Gertz decision would appear to be broad enough to cover [the private, non-media defendant]. As the Supreme Court declares, the protection of the First Amendment extends to freedom of speech as well as to freedom of the press, and the interests that must be balanced to obtain a proper accommodation are similar. It would seem strange to hold that the press, composed of professionals and causing much greater damage because of the wider distribution of the communication, can constitutionally be held liable only for negligence, but that a private person, engaged in a casual private conversation with a single person, can be held liable at his peril if the statement turns out to be false, without any regard to his lack of fault.
Like the First Amendment to the United States Constitution, Article I, § 7 of the Louisiana Constitution, quoted infra, prohibits any law curtailing or restraining freedom of speech as well as freedom of the press. Therefore, apart from any future Supreme Court holding based on constitutional grounds, we conclude as a matter of state law that the Gertz and Philadelphia Newspapers holdings should apply to media and non-media defendants alike. Such a holding has previously been adopted in at least one appellate court decision from this state. Wattigny v. Lambert, 408 So.2d 1126, 1130-1131 (La. App. 3 Cir.), writ denied, 410 So.2d 760 (1981), cert. denied, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). Courts in other states, applying a similar rationale, have adopted a similar holding. Jacron Sales Co., Inc. v. Sindorf, 276 Md. 580, 350 A.2d 688 (1976); Bryan v. Brown, 339 So.2d 577 (Ala.1976); Ryder Truck Rentals, Inc., v. Latham, 593 S.W.2d 334 (Tex.Civ.App. El Paso, 11/14/79).

Fault
Having concluded that the rules announced in Gertz and Philadelphia Newspapers apply to non-media defendants, and hence to the present case, we must next decide the standard of liability that should govern in a case, such as this one, in which a private individual is allegedly injured by a defamatory communication by a non-media defendant about a matter of public concern, a question we *679 expressly left unresolved in Trentecosta, 96-2388 at 13, 703 So.2d at 561.
In holding that "so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability"[9] for a publisher of a defamatory falsehood injurious to a private individual, the Supreme Court in Gertz effectively sanctioned a simple negligence standard as complying with the minimum requirements of the First and Fourteenth Amendments.[10] Nevertheless, under Gertz, the states remain free to adopt stricter standards of liability than negligence, and at least one current and one former member of this court have urged that we do so. Trentecosta, 96-2388 at 1, 703 So.2d at 565 (Johnson, J., dissenting); Romero v. Thomson Newspapers (Wisconsin), Inc., 94-1105, p. 1 (La.1/17/95), 648 So.2d 866, 871 (Dennis, J., concurring). However, for the reasons expressed below, we decline the invitation to adopt a New York Times standard of liability in cases involving private individuals and matters of public concern, and instead adopt the negligence standard set forth in the RESTATEMENT (SECOND) OF TORTS § 580B. Our reasons for doing so are fourfold.
First, the considerations which prompted the Supreme Court to adopt an actual malice standard of liability in defamation actions involving public officials and public figures do not, as the Supreme Court recognized in Gertz, apply with equal force when private individuals are involved. The First Amendment interest in vigorous reporting of the activities of public officials is clearly more compelling than the interest in reporting activities of private individuals because "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S.Ct. 669, 675-676, 15 L.Ed.2d 597 (1966). Further, the extension of New York Times to public figures may be justified on the grounds that a state has a less substantial interest in protecting persons who have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods. Gertz, 418 U.S. at 345, 94 S.Ct. at 3010. By contrast, private individuals are less likely to seek public attention and comment, and typically have less access to channels of effective communication to counteract false statements. Id. They are at once both more vulnerable to injury and more deserving of protection and recovery. Id.
Second, Louisiana's interest in protecting the reputations of private individuals is clearly expressed and preserved in our constitution. Louisiana Constitution art. I, § 7 provides:
No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible *680 for abuse of that freedom. [Emphasis added.]
Our constitution has expressly balanced the right of free speech with the responsibility for abuse of that right. This concern for the abuse of free speech is not explicitly found in the United States Constitution. Courts in other states with similar clauses in their constitutions have interpreted the proviso against abuse as evidencing an express concern for injury to reputation that justifies adoption of a negligence standard for private plaintiffs in defamation actions. Jones v. Palmer Communications, Inc., 440 N.W.2d 884, 896 (Iowa 1989); Troman v. Wood, 62 Ill.2d 184, 340 N.E.2d 292 (1975); McCall v. Courier-Journal and Louisville Times Company, 623 S.W.2d 882 (Ky.1981); Martin v. Griffin Television, Inc., 549 P.2d 85 (Okl.1976). We agree with this line of cases and will not ignore the express concern for injury to reputation found in the Louisiana Constitution.
Third, adoption of a negligence standard promotes simplicity and consistency in the law of defamation, at least insofar as private individuals are concerned. In our recent decision in Costello v. Hardy, supra, a case involving a private individual injured by a defamatory falsehood in a matter of purely private concern, we held that the malice, or fault, necessary to establish an action in defamation is a lack of reasonable belief in the truth of the statement giving rise to the defamation. Citing the RESTATEMENT (SECOND) OF TORTS § 580B, we explained that "[m]alice in this sense is more akin to negligence with respect to the truth than to spite or improper motive." Costello, 03-1146 at 18-19, 864 So.2d at 143. We thereby endorsed the negligence standard of liability in actions by private individuals involving matters of private concern.[11] Adopting the same standard of liability for private individuals respecting matters of public concern simplifies the law in what has, admittedly, become a complex area.
Finally, a review of the relevant jurisprudence reveals that in the wake of Gertz, a majority of states to consider the issue have adopted negligence as the standard of liability in defamation actions by private individuals. See, e.g., Jones v. Palmer Communications, Inc., 440 N.W.2d at 896; Foster v. Laredo Newspapers, Inc., 541 S.W.2d 809 (Tex.1976); Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co., 43 Ohio App.2d 105, 334 N.E.2d 494 (1974); Cahill v. Hawaiian Paradise Park Corporation, 56 Haw. 522, 543 P.2d 1356 (1975); Troman, 62 Ill.2d 184, 340 N.E.2d 292; Gobin v. Globe Publishing Company, 216 Kan. 223, 531 P.2d 76 (1975); Jacron Sales Co., Inc., 276 Md. 580, 350 A.2d 688; Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 330 N.E.2d 161 (1975); Taskett v. KING Broadcasting Company, 86 Wash.2d 439, 546 P.2d 81 (1976); Mead Corporation v. Hicks, 448 So.2d 308, 312 (Ala.1983); Peagler v. Phoenix Newspapers, Inc., 114 Ariz. 309, 560 P.2d 1216 (1977); Miami Herald Publishing Company v. Ane, 458 So.2d 239 (Fla.1984); Triangle Publications, Inc. v. Chumley, 253 Ga. 179, 317 S.E.2d 534 (1984); Rouch v. Enquirer & News of Battle Creek, 427 Mich. 157, 398 N.W.2d 245 (1986); Marchiondo v. Brown, 98 N.M. 394, 649 P.2d 462 (1982); Martin v. Griffin Television, Inc., 549 P.2d 85 (Okl.1976); Denny v. Mertz, 106 Wis.2d 636, 318 N.W.2d 141 (1982); Memphis Publishing Co. v. Nichols, 569 S.W.2d 412 (Tenn.1978).
*681 We join that majority today and hold that the standard of negligence set forth in the RESTATEMENT (SECOND) OF TORTS § 580B is to be applied in cases such as the present one, involving a private individual allegedly injured by a defamatory falsehood in a matter of public concern. Section 580B states:
One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.
Based on the foregoing, to prevail on his claim against Jack in the Box[12] in the present case, Kennedy bears the burden of affirmatively proving (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) negligence (as set forth in the RESTATEMENT (SECOND) OF TORTS § 580B) on the part of Jack in the Box's employees; and (4) resulting injury. If even one of these required elements is found lacking, the cause of action fails. Costello, 03-1146 at 12, 864 So.2d at 140.

Conditional or Qualified Privilege
In Louisiana, privilege is a defense to a defamation action. Costello, 03-1146 at 15, 864 So.2d at 141. The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability. Toomer v. Breaux, 146 So.2d 723, 725 (La.App. 3 Cir.1962). Privileged communications are divided into two general classes: (1) absolute; and (2) conditional or qualified. Madison v. Bolton, 234 La. 997, 102 So.2d 433, 439 n. 7 (1958). An absolute privilege exists in a limited number of situations, such as statements by judges and legislators in judicial and legislative proceedings. Id. A conditional or qualified privilege arises in a broader number of instances. Id. In fact, there are a variety of situations in which the interest that an individual is seeking to vindicate or to further is regarded as sufficiently important to justify some latitude for making mistakes so that publication of defamatory statements is deemed to be conditionally or qualifiedly privileged. Trentecosta, 96-2388 at 18, 703 So.2d at 563. It is impossible to reduce the scope of a conditional or qualified privilege to any precise formula. Id. Nevertheless, the elements of the conditional privilege have been described as "good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only." Madison, 102 So.2d at 439 n. 7. The privilege, it has been held, "arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be *682 held liable in damages if the good faith communication later turns out to be inaccurate." Toomer, 146 So.2d at 725.
Early appellate court decisions in Louisiana characterized the conditional or qualified privilege as applying "if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty." Toomer, 146 So.2d at 725; Elmer v. Coplin, 485 So.2d 171, 176 (La.App. 2 Cir.), writ denied, 489 So.2d 246 (1986). Under this formulation, which finds its genesis in Madison's citation of a passage from an encyclopedia,[13] courts typically focused on the requirements of good faith and proper publication to determine in the first instance if the privilege applied.
In Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730, we eschewed that approach, holding that the analysis for determining whether a conditional privilege exists involves a two-step process. Smith, 93-2512 at 18, 639 So.2d at 745.[14] First, it must be determined whether the attending circumstances of a communication occasion a qualified privilege. Id. The second step of the analysis is a determination of whether the privilege was abused, which requires that the grounds for abuse  malice or lack of good faith  be examined. Id. "While the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury `[u]nless only one conclusion can be drawn from the evidence.'" Id., quoting W. KEETON ET AL., PROSSER & KEETON ON TORTS § 115 at 835 (5th ed.1984).
Following this analysis, we note that in the present case, Jack in the Box asserted the affirmative defense of qualified or conditional privilege in answer to the petition filed by Kennedy, alleging that such a privilege obtains when a report of a possible crime is communicated to the proper authorities for investigation. The existence of the privilege, and the lack of evidence of abuse of the privilege (and hence the absence of a factual dispute), was the focus of Jack in the Box's motion for summary judgment.
The essence of the qualified or conditional privilege claimed by Jack in the Box in the present case is that its employees were simply communicating suspected wrongful acts to officials authorized to protect the public from such acts, which, if substantiated, would implicate important community interests. The RESTATEMENT (SECOND) OF TORTS § 598 describes the public interest privilege as follows:
An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
(a) there is information that affects a sufficiently important public interest, and
(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.
*683 Comment (d) to Section 598 states that the privilege is applicable "when any recognized interest of the public is in danger, including the interest in the prevention of crime and the apprehension of criminals." Louisiana courts have similarly recognized that the public has an interest in possible criminal activity being brought to the attention of the proper authorities, and have extended a qualified privilege to remarks made in good faith. Simon v. Variety Wholesalers, Inc., XXXX-XXXX (La.App. 1 Cir. 5/11/01), 788 So.2d 544, writ denied, 01-2371 (La.11/16/01), 802 So.2d 617; Jones v. Wesley, 424 So.2d 1109(La.App. 1 Cir.1982); Crump v. Crump, 393 So.2d 337 (La.App. 1 Cir.1980). The public policy reasons supporting the extension of such a privilege are succinctly stated in Arellano v. Henley, 357 So.2d 846, 849 (La.App. 4 Cir.1978):
It would be self-defeating for society to impose civil liability on a citizen for inaccurately reporting criminal conduct with no intent to mislead. If the risks to the citizen are too high, a fertile field for criminal suppression will have disappeared.
In other words, the qualified or conditional privilege extended to the communication of alleged wrongful acts to the officials authorized to protect the public from such acts is founded on a strong public policy consideration: vital to our system of justice is that there be the ability to communicate to police officers the alleged wrongful acts of others without fear of civil action for honest mistakes.
The privilege clearly applies in the present case, as the employees of Jack in the Box reported circumstances involving a matter affecting the public interest  the possible commission of a crime (counterfeiting or "[m]onetary instrument abuse")  to the police, who had a duty to take action should the allegations prove to be true. It is the second step of the privilege analysis  the determination of whether the privilege was abused  on which the resolution of this case ultimately hinges.
The practical effect of the assertion of the conditional or qualified privilege is to rebut the plaintiff's (Kennedy's) allegations of malice (or fault, which in this case amounts to negligence) and to place the burden of proof on the plaintiff to establish abuse of the privilege. Smith, 93-2512 at p. 20, 639 So.2d at 746. In order to resolve the motion for summary judgment at issue in this case it is critical to define the circumstances that constitute an abuse of the conditional privilege.
Historically, courts in Louisiana ruled that the conditional privilege was defeated by proof that the defamatory statements were made with malice in fact, i.e., that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made. Berot v. Porte, 144 La. 805, 81 So. 323 (1919). At least since the decision of this court in Madison v. Bolton, supra, courts have held that the conditional privilege is defeated by proof that the defamatory statements were not made in good faith, or more precisely, with reasonable grounds for believing the statements to be true. According to the courts, it is "[o]nly when lack of such reasonable grounds is found can it be said that the person uttering the statement is actuated by malice or ill will." Elmer, 485 So.2d at 177, citing Ward v. Sears Roebuck & Company, 339 So.2d 1255 (La.App. 1 Cir.1976). See also, Smith, 93-2512 at p. 17, 639 So.2d at 744-745, in which we reviewed Louisiana jurisprudence on the qualified or conditional privilege and noted that, in Louisiana, the most commonly cited ways in which the conditional privilege can be abused are when the defendant's remarks are made *684 with malice or without good faith or for a purpose outside of the scope of the privilege. We affirmed that in this context, "good faith" is synonymous with "without malice," and means having reasonable grounds for believing that the statement is correct. Id., 93-2512 at 23-24, 639 So.2d at 749.
A few years subsequent to our decision in Smith v. Our Lady of the Lake Hospital, Inc., supra, we had occasion to once again examine the qualified or conditional privilege in the context of a defamation action. Trentecosta, supra, presented a defamation claim by the owner of a bingo hall against three police officers and the Louisiana Department of Public Safety and Corrections seeking damages arising from statements made by one officer to the press that plaintiff was operating an illegal bingo hall which had bilked charities out of thousands of dollars. We granted certiorari in that case "primarily to address the question of whether the law enforcement officers enjoyed a qualified privilege in reporting on an investigation and a resulting arrest, and whether they abused the privilege." Trentecosta, 96-2388 at 7, 703 So.2d at 558. In the course of our examination, we noted that the constitutional restraints imposed on the tort of defamation by virtue of the New York Times decision have called into question the continued viability of the conditional or qualified privilege. We explained:
[U]nder the jurisprudence engendered by Sullivan and Gertz which requires some defamation plaintiffs to prove actual malice with regard to the falsity of the statement, such proof also proves the lack of any reasonable grounds for belief in the truth of the statement, which is the equivalent of proving the defendant's abuse of any privilege urged as a defense.
Arguably, conditional privileges therefore have lost their significance under the current state of the law which requires the offended person to prove the publisher's fault with regard to the falsity of the statement, at least when proof of actual malice is required as an element of the cause of action.
Trentecosta, 96-2388 at 7, 703 So.2d at 562-563. Rather than reject the conditional privilege analysis as superfluous in light of the New York Times and Gertz requirements, we instead adopted the approach of the RESTATEMENT (SECOND) OF TORTS §§ 599-600; we held that, at least insofar as the privilege respecting reports of governmental proceedings and activities is concerned, the privilege is abused if the publisher (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity. Trentecosta, 96-2388 at 20 n. 16, 703 So.2d at 564 n. 16. In other words, since Trentecosta, mere negligence as to falsity (or lack of reasonable grounds for believing the statement to be true) is no longer sufficient to prove abuse of the conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose.
While Trentecosta, in fact, concerned a different privilege (the privilege respecting reports of governmental proceedings and activities) than that asserted in this case, we perceive no reason that its holding should not be extended to the privilege for the communication of alleged wrongful acts to an official authorized to protect the public from such acts. Our reasons for making this determination are as follows.
First, adopting the approach of the RESTATEMENT (SECOND) OF TORTS § 600 in this instance acknowledges the changes in defamation law that have been wrought by the Supreme Court's interpretation of the First Amendment, and adjusts to the *685 evolving law in this area. Since Gertz, it is apparent that there is an inherent conflict between the constitutional fault (negligence or greater) that a plaintiff bears the burden of proving in certain situations and the lack of reasonable grounds for belief in the truth of the statement (basically, negligence as to the truth) which has traditionally formed a basis for abuse of the privilege in Louisiana. If a plaintiff proves the required constitutional fault (negligence or greater) in order to have a cause of action, he has by that action proved the abuse of any conditional privilege that might apply, and rendered the conditional privilege analysis irrelevant. RESTATEMENT (SECOND) OF TORTS, Special Note on Conditional Privileges and the Constitutional Requirement of Fault at 259-260.
Nevertheless, privileges continue to serve an important function in our law. A conditional privilege is one of the methods utilized for balancing the interest of the defamed person in the protection of his or her reputation against the interests of the publisher, of third persons, and of the public in having the publications take place. The latter interests are not strong enough under the circumstances to create an absolute privilege but they are of sufficient significance to relax the usual standard of liability. RESTATEMENT (SECOND) OF TORTS § 598 cmt. b. Adopting the actual malice standard (knowing falsity or reckless disregard for the truth) of the RESTATEMENT allows courts to continue to balance these competing interests in accordance with the particular facts of each case, and in the process, to retain the hierarchy of specially protected types of speech that we have traditionally recognized.[15]
Second, since the decision in New York Times, courts in a growing number of jurisdictions have held that knowing falsity or reckless disregard for the truth on the part of the defendant must be shown to defeat a qualified privilege. Barreca v. Nickolas, 683 N.W.2d 111 (Iowa 2004); Marchesi v. Franchino, 283 Md. 131, 387 A.2d 1129 (1978); Rice v. Hodapp, 919 S.W.2d 240 (Mo.1996); Dun & Bradstreet, Inc. v. O'Neil, 456 S.W.2d 896 (Tex.1970); Bender v. City of Seattle, 99 Wash.2d 582, 664 P.2d 492 (1983). The shift to this standard is prompted in no small part by the desire to simplify and create consistency between constitutional law and state law definitions of fault and malice as respects the tort of defamation, a goal we endorse herein.[16]
Finally, adoption of the knowing falsity or reckless disregard for the truth standard of abuse in this case, which involves a report to law enforcement officers of suspected criminal activity, strikes a necessary and appropriate balance between a person's interest in protecting his or her reputation and the need to encourage individuals to report suspected criminal activity to the proper authorities without fear of being exposed to civil liability for honest mistakes. Unless such protection is extended, fear of being exposed to civil liability could discourage individuals from alerting police to suspicious activity, thereby enabling criminals to escape detection and endangering other potential victims. Individuals *686 who engage in behavior beneficial to society should not be penalized by facing exposure to civil liability for mistakes in judgment attributable to simple negligence.
Consistent with our decision in Trentecosta, we hold that knowledge of falsity or reckless disregard for truth, the standard adopted in the RESTATEMENT (SECOND) OF TORTS § 600, is the standard by which abuse of the conditional privilege asserted in this case is to be determined.

Summary Judgment
In light of the foregoing principles, we turn now to an examination of Jack in the Box's motion for summary judgment and the court of appeal's decision reversing the district court judgment in favor of Jack in the Box.
As a preliminary matter, we note that because of the chilling effect on the exercise of free speech, defamation actions have been found particularly susceptible to summary judgment. Summary adjudication, we have recognized, is a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech and press. Mashburn v. Collin, 355 So.2d 879, 890-891 (La.1977).[17]
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991). A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." LSA-C.C.P. art. 966(B). The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of civil actions (with the exception of certain domestic matters) and is now favored in our law. LSA-C.C.P. art. 966(A)(2). Of particular relevance to the instant case is LSA-C.C.P. art. 966(C)(2), which states:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
This court has recognized that a "genuine issue" is a "triable issue," or one on which reasonable persons could disagree. *687 Champagne v. Ward, 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 777. A "material fact" is a fact, the existence or non-existence of which may be essential to plaintiff's cause of action under the applicable theory of recovery. Id.
With these principles in mind, we turn to an examination of the pleadings and evidence submitted in connection with Jack in the Box's motion for summary judgment.
In this case, Jack in the Box asserted the affirmative defense of conditional privilege in its answer. Its motion for summary judgment was based on the contention that the actions of its employees were protected by the conditional or qualified privilege and that there was no evidence of abuse, and hence a lack of factual dispute, entitling it to judgment as a matter of law. In connection with the motion, Jack in the Box submitted the affidavits of Deputy Eric Jones and Lieutenant Richard Harris of the East Baton Rouge Parish Sheriff's Office. The affidavits, which are virtually identical, recite in pertinent part that an employee of Jack in the Box called the East Baton Rouge Parish Sheriff's Office on December 7, 2001, and reported that someone had attempted to buy food with a counterfeit one hundred dollar bill. Deputy Jones and Lieutenant Harris were dispatched to the location, where Deputy Jones was informed by two restaurant employees that an occupant of a vehicle in the drive-through lane had attempted to make a food purchase with a counterfeit one hundred dollar bill. The employees presented the bill to Deputy Jones. Both Deputy Jones and Lieutenant Harris examined the bill and confirmed that it "looked suspicious ... as the bill appeared to be short and dark in color and the size of Benjamin Franklin's head looked small." The officers both noted that, at the time of the incident, there had been many cases of counterfeit bills being used at Circle K and Exxon stores in the area. The Jack in the Box employees pointed out the vehicle from which the one hundred dollar bill was tendered, which was still in the drive-through lane. At that point, the involvement of Jack in the Box's employees ceased, and the East Baton Rouge Parish officers took over.
The affidavits submitted by Jack in the Box confirm the existence of the conditional or qualified privilege. They establish that employees of Jack in the Box reported a matter affecting the public interest  the possible commission of a crime  to police, who have the duty to take action should the allegations prove true.[18] As noted earlier, the effect of the assertion of the conditional or qualified privilege is to rebut the plaintiff's allegations of fault and shift the burden to plaintiff to establish abuse of the privilege. Smith, 93-2512 at 20, 639 So.2d at 746. In other words, once the privilege is established, it becomes incumbent on the plaintiff to come forward with rebuttal evidence establishing abuse. Required proof of abuse in this particular case is proof that the defendant/publisher knew the defamatory statement to be false, or acted in reckless disregard as to its truth or falsity.[19]
In the present case, there is no allegation and certainly no evidence to support a *688 contention that the Jack in the Box employees who alerted Sheriff's deputies to the suspected counterfeit currency knew their statements were false. In fact, Kennedy's petition alleges only negligence on the part of Jack in the Box and its employees. Therefore, to meet his evidentiary burden in this case, plaintiff must establish that the statements of the Jack in the Box employees were made with reckless disregard for whether they were true or false.
While "reckless disregard" cannot be fully encompassed in one definition, the courts have provided some guidance on application of the standard. Trentecosta, 96-2388 at 14, 703 So.2d at 561, citing St. Amant v. Thompson, 390 U.S. 727,730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). For example, in Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), the Supreme Court explained that only those false statements made with a high degree of awareness of their probable falsity meet the reckless disregard standard. In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Supreme Court reiterated that reckless disregard requires a plaintiff to "prove that the publication was deliberately falsified, or published despite the publisher's awareness of probable falsity." Id., 388 U.S. at 153, 87 S.Ct. at 1991. Finally, in St. Amant v. Thompson, supra, the Supreme Court explained that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325. Under this standard, even proof of gross negligence in the publication of a false statement is insufficient to prove reckless disregard. Davis v. Borskey, 94-2399, p. 10 (La.9/5/95), 660 So.2d 17, 23, citing Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991). Rather, there must be evidence that the defendant was highly aware that the statements were probably false. Id.
In opposing Jack in the Box's motion for summary judgment, plaintiff submitted his own affidavit, which simply recites that he tendered payment of a 1974 series one hundred dollar bill to a Jack in the Box employee "while unknown to affiant, the Jack in the Box employee communicated to law enforcement officers that someone in Affiant's party had attempted to purchase food and drink with a counterfeit $100 bill." No other allegations appear with respect to the conduct of the Jack in the Box employees. In opposing the Sheriff's separate motion for summary judgment, plaintiff also submitted the Sheriff's responses to interrogatories propounded by the plaintiff. In those responses, the Sheriff indicated that the deputies had received no formal training or instruction in detecting counterfeit currency.
In its decision reversing the district court's summary judgment in favor of Jack in the Box, the court of appeal examined this evidence and concluded that "questions of fact remain as to whether the defendants took action to set a criminal investigation in motion on the basis of unfounded suspicion and conjecture." Kennedy, 04-0574 at 11, 899 So.2d at 689. According to the court of appeal, "[t]he type of reasonable and trustworthy information sufficient to justify a man of average caution in the belief that a person has tendered a counterfeit bill would seem to require some knowledge or training in *689 the detection of counterfeit bills to constitute probable cause." Id. Because there was no showing by either defendant that its employees were provided with instruction, training, or procedures to address suspicions of counterfeit money, or with counterfeit detection markers, the court of appeal concluded that defendants failed to show that they acted reasonably or without a reckless disregard for Kennedy's rights when a criminal investigation was instituted because the bill looked unusual. Id.
With all due respect to the court of appeal, its judgment reflects an erroneous application of the law. First, as explained above, it was not defendant's burden to establish that its employees acted without knowledge of falsity or reckless disregard for the truth; once the privilege was established, it was plaintiff's burden to demonstrate abuse. Further, as we explained in Trentecosta, conduct which would constitute reckless disregard is typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have put it in circulation. Trentecosta, 96-2388 at 15, 703 So.2d at 561-562, quoting St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. In the instant case, there was absolutely no evidence offered to demonstrate such conduct on the part of any employee of Jack in the Box. In fact, if anything, the suspicions of the Jack in the Box employees that the bill was counterfeit were shown to have a basis in fact, as evidenced by the affidavits of the two Sheriff's deputies, attesting to the fact that the bill looked "suspicious" because it "appeared to be short and dark in color and the size of Benjamin Franklin's head looked small."
The crux of the court of appeal decision appears to be its conclusion that Jack in the Box's employees failed to take reasonable measures to verify the authenticity of the bill before reporting their suspicions to police. However, it is quite clear that mere negligence as to falsity is not sufficient to amount of abuse of a conditional or qualified privilege. RESTATEMENT (SECOND) OF TORTS § 600 cmt. b. As we have noted, failure to investigate does not present a jury question on whether a statement was published with reckless disregard for the truth. Romero, 648 So.2d at 869. In this instance, the suspicions of the Jack in the Box employees clearly were not arbitrary, as the bill does not resemble modern currency. While it might have been more reasonable for the employees to have had training in the identification of counterfeit currency or a counterfeit detection marker, the plaintiff cannot show reckless disregard for the truth by demonstrating only that the defendant acted negligently and failed to investigate fully before contacting police. Davis, 94-2399 at 13, 660 So.2d at 24-25; Romero, 648 So.2d at 869. The failure of Jack in the Box employees to receive training in the detection of counterfeit currency or to investigate further before contacting police is insufficient to establish reckless disregard for the truth.
Given the failure of plaintiff to make any factual showing of knowing falsity or reckless disregard for the truth on the part of defendant's employees, reasonable minds, viewing the evidence in Kennedy's favor, must inevitably conclude that defendant's defamatory statements were privileged and that the privilege was not abused. Because plaintiff failed to submit evidence sufficient to show that he will be able to meet his burden of proof at trial that defendant abused the conditional or qualified privilege, summary judgment on Kennedy's defamation claim was properly granted by the district court. The court of appeal erred in reversing that summary judgment.
Summary judgment was also properly granted by the district court on *690 Kennedy's claim against Jack in the Box for wrongful arrest. Wrongful arrest, or the tort of false imprisonment, occurs when one arrests and restrains another against his will and without statutory authority. Kyle v. City of New Orleans, 353 So.2d 969 (La.1977). The tort of false imprisonment consists of the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention. Tabora v. City of Kenner, 94-613, p. 8 (La.App. 5 Cir. 1/8/95), 650 So.2d 319, 322, writ denied, 95-0402 (La.3/30/95), 651 So.2d 843. In the instant case, the district court found that there are no facts in the record to show detention of the plaintiff by Jack in the Box or any of its employees, and the court of appeal did not disturb this finding. Our review of the record confirms the correctness of the district court's determination in this regard. The affidavit of Kennedy, submitted in opposition to the Jack in the Box motion for summary judgment, confirms that, after placing his order and tendering payment, Kennedy simply waited in line for his food. There is no allegation that any employee of Jack in the Box restrained him or prevented him from leaving. Kennedy was detained only when Sheriff's deputies asked him to leave the drive through lane and to exit the car, whereupon he was handcuffed and transported to a nearby substation. There is thus no factual support for an essential element of plaintiff's cause of action. Summary judgment was appropriate as to the false imprisonment claim against Jack in the Box.[20]

CONCLUSION
For the reasons expressed above, we find that the report to law enforcement officers of suspected criminal activity by *691 Jack in the Box employees was conditionally privileged, and that plaintiff failed to submit evidence sufficient to show that he will be able to meet his burden of proof at trial that defendant abused the conditional privilege. Because plaintiff cannot produce factual support for an essential element of his cause of actionproof of an unprivileged communication to a third partysummary judgment was properly granted by the district court. The decision of the court of appeal with respect to defendant Jack in the Box is reversed and the judgment of the district court granting summary judgment in favor of defendant Jack in the Box is reinstated.
REVERSED.
JOHNSON, J., dissents.
NOTES
[1] Although plaintiff named "Jack in the Box Eastern Division L.P. d/b/a Jack in the Box Restaurant" as defendant, an answer was filed in the name of "Jack in the Box, Inc." (hereinafter "Jack in the Box").
[2] The Sheriff did not seek supervisory relief in this court; therefore, we will not discuss any issues respecting the wrongful arrest claim pending against the Sheriff.
[3] The Supreme Court pointed out that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times, 376 U.S. at 270, 84 S.Ct. at 721.
[4] A "public figure" is a non-public official who is intimately involved in the resolution of important public questions or who, by reason of his or her fame, shapes events in areas of concern to society at large. Butts, 388 U.S. at 164, 87 S.Ct. at 1996 (Warren, C.J., concurring in result).
[5] Any discussion of the impact of the First Amendment on defamation law would not be complete without also mentioning the Supreme Court's plurality decision in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In contrast to the Supreme Court's earlier decisions, Dun & Bradstreet involved a private-figure plaintiff suing a non-media defendant over speech of purely private concern. In such a scenario, a plurality of the Supreme Court held that, in light of the reduced constitutional value of speech involving matters of purely private concern as opposed to speech on matters of public concern, the state interest in compensating private individuals for injury to their reputation adequately supports awards of presumed and punitive damages  even absent a showing of "actual malice." Dun & Bradstreet, 472 U.S. at 761, 105 S.Ct. at 2946. In other words, the Supreme Court ruled that when the plaintiff is a private individual and the speech is of private concern, the First Amendment does not necessarily force any change in at least some of the features of the common law of defamation.

Our decision in Costello, supra, which involved a private plaintiff, a non-media defendant, and speech of purely private concern, was guided by the ruling in Dun & Bradstreet.
[6] The Supreme Court has described speech on matters of public concern as speech "relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Whether speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the entire record. Id., 461 U.S. at 147-148, 103 S.Ct. at 1690. Clearly, a report to law enforcement regarding the suspected distribution of counterfeit currency in the community is a matter of public concern, as it is an issue about which information is appropriate and needed, and in which the public, and particularly the business community, may reasonably be expected to have a legitimate interest.
[7] It is clear that the holding in Gertz was limited to media expression. Not only was the defendant in that case a member of the media, but the opinion itself is replete with references to "the news media," "publishers and broadcasters," and "the press and broadcast media." Gertz, 418 U.S. at 341, 348, 94 S.Ct. at 3007, 3011. The opinion in Philadelphia Newspapers similarly confines itself to media expression. Philadelphia Newspapers, 475 U.S. at 779 n. 4, 106 S.Ct. at 1565 n. 4.
[8] New York Times, 376 U.S. at 270, 84 S.Ct. at 721.
[9] Gertz, 418 U.S. at 347, 94 S.Ct. at 3010.
[10] At one point in its discussion, the Supreme Court noted: "Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." Gertz, 418 U.S. at 348, 94 S.Ct. at 3011. Elsewhere, in holding that the states may not permit recovery of presumed or punitive damages when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth, the Gertz court explained that "punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions." Gertz, 418 U.S. at 350, 94 S.Ct. at 3012. Finally, in his concurring opinion, Justice Blackmun frankly explains that "the Court now conditions a libel action by a private person upon a showing of negligence." Id., 418 U.S. at 353, 94 S.Ct. at 3014.
[11] It must be pointed out that Costello did not involve words that were defamatory per se; therefore, the presumptions of falsity, malice (or fault), and injury did not apply, and the burden of proving each of those elements remained with the plaintiff.
[12] While defamation is an individual tort which, as a general rule, does not give rise to solidary liability, when the defamatory statements are made by an employee in the course and scope of his or her employment, liability is nevertheless attributable to the employer under vicarious liability principles. Trentecosta, 96-2388 at 8-10, 703 So.2d at 558-559. Jack in the Box does not contend that the employee who reported the suspicious currency to police was not acting in the course and scope of her employment.
[13] Madison, 102 So.2d at 439 n. 7, cites 33 Am.Jur. Verbo Libel and Slander § 124-126 at 123-126 as authority for this particular formulation of the privilege.
[14] While the precise issue before this court in Smith was the construction to be given LSA-R.S. 13:3715.3(C), granting qualified immunity to peer review committees, we expressly drew on the jurisprudence regarding the conditional or qualified privilege to interpret the statutory provision.
[15] Adopting the knowing or reckless disregard for the truth standard in this particular case honors the heightened protection that we have recognized should be accorded to speech on matters of public concern. See, Romero, 648 So.2d at 869.
[16] In Louisiana, defamation is a delict governed by LSA-C.C. art. 2315. Miller v. Holstein, 16 La. 389, on reh'g., 16 La. 395 (La. 1840). Nevertheless, in examining the parameters of the tort, Louisiana courts have drawn on and borrowed from the common law terminology. See e.g., Madison v. Bolton, supra.
[17] In Sassone v. Elder, 626 So.2d 345 (La. 1993), we held that the summary judgment standard is different in defamation cases than in other cases; in order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial.

Since our decision in Sassone, the legislature has amended the summary judgment articles, 1996 La. Acts, 1st Ex.Sess., No. 9, with the result that summary judgment is now favored, thereby eliminating the need for courts to impose a different summary judgment standard in defamation cases. Nevertheless, the considerations that make defamation actions particularly susceptible to summary judgment remain the same.
[18] In fact, the allegations of Kennedy's petition confirm the circumstances giving rise to the privilege, as the petition avers that "Jack in the Box employee(s) made the false allegation to law enforcement officers that the plaintiff had passed counterfeit or unlawful tender at its restaurant, causing the plaintiff's arrest on a false complaint." There is no allegation in any pleading that the communication was made to anyone other than the appropriate law enforcement personnel.
[19] We note, incidentally, that in a case such as this one, where a conditional privilege is found to exist, the negligence standard that is part of plaintiff's prima facie case is logically subsumed in the higher standard for proving knowing falsity or reckless disregard as to truth or falsity. Therefore, the negligence analysis drops out of the case, for if the plaintiff is incapable of proving the knowing falsity or reckless disregard as to truth or falsity necessary to overcome the privilege, it is of no consequence that he or she might be able to prove the lesser standard of negligence.
[20] In brief, Kennedy argues that there is a "parallel" between his claim for defamation and an action for malicious prosecution. To the extent that this argument belatedly attempts to assert that plaintiff has stated a claim for malicious prosecution that should not have been dismissed on summary judgment, we find it to be without merit.

The elements necessary to support a claim for malicious prosecution are: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff. Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d 446, 452 (La.1987); Jones v. Soileau, 448 So.2d 1268, 1271 (La.1984). Never favored in our law, a malicious prosecution action must clearly establish that the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent. Johnson v. Pearce, 313 So.2d 812, 816 (La.1975).
In this case, it is clear that plaintiff has failed to produce factual support sufficient to show that he will be able to meet his burden of proof at trial as to the second element of the malicious prosecution claim: legal causation by Jack in the Box. The affidavits of Deputy Jones and Lieutenant Harris, introduced in support of the Jack in the Box motion for summary judgment, establish that the employees of Jack in the Box merely reported their suspicions of counterfeit currency to the Sheriff's Office. When the deputies arrived at the restaurant, Jack in the Box employees pointed out the vehicle from which the one hundred dollar bill had been tendered and handed over the suspect currency. At that point, the involvement of Jack in the Box employees ceased, and the East Baton Rouge Parish officers took over, conducting their own examination of the currency before approaching the plaintiff. Given these facts, which were not controverted by plaintiff, it is clear that any chain of causation regarding plaintiff's subsequent detention was broken. The decision to detain plaintiff was made by the independent actions and investigation of the Sheriff's Office. See, Banks v. Brookshire Brothers Inc., 93-1616 (La.App. 3 Cir. 6/01/94), 640 So.2d 680. Therefore, because plaintiff cannot establish that he will be able to provide factual support sufficient to satisfy his burden of proving legal causation, an essential element of a malicious prosecution action, that claim (to the extent it was stated) was properly dismissed.