GUIDRY, J.
*1008 Plaintiff, who was arrested for stealing a missing dog, appeals a summary judgment dismissing his claims of defamation and emotional distress relative to the circumstances of the arrest.
FACTS AND PROCEDURAL HISTORY
On April 30, 2013, Kyle Holmes's girlfriend discovered a stray dog at his residence. Calls to a local veterinarian and neighbors failed to reveal the owner of the dog, so the following day, Holmes posted a notice on Facebook that he was in possession of the dog and inquired whether anyone was willing to take it. A former high school classmate, Lori Williams, responded to the posting, expressing a willingness to take the dog. Holmes arranged to deliver the dog to Williams the following day. A couple of days later, Holmes left to go out of state on a six-day hunting trip.
Soon after Holmes left on his hunting trip, he was contacted by one of his neighbors. The neighbor informed Holmes that he believed the owner of the stray dog was Tommy Lea. Although the neighbor provided Holmes with Lea's contact information, Holmes did not attempt to contact Lea until three days after he returned home from his hunting trip. In the meantime, because Lea had received no communication from Holmes, Lea contacted Kevin Garig, a deputy with the East Feliciana Parish Sheriff's Office, regarding the dog. Garig, in turn, contacted Holmes. Holmes informed Garig that he had given the dog to Williams and provided Garig with Williams's phone number. Williams, in turn, told Garig that the dog had run away.
Due to certain discrepancies in the information conveyed by Holmes and Williams, as well as the delay in attempting to communicate with Lea about the dog, Garig filed an affidavit for warrant for Holmes's an arrest for the theft of Lea's dog.[1] Further investigation by law enforcement later revealed that Williams had not lost the dog as she had stated, but had given it away. The dog was later recovered and returned to Lea. The East Feliciana Parish District Attorney's Office, nevertheless, prosecuted Holmes on the charge of theft of an animal in violation of La. R.S. 14:67.2(B)(1),[2] Holmes was eventually found not guilty of the charge.
On July 18, 2013, Holmes filed a petition for damages against Lea and Garig[3] claiming defamation, libel, slander, past lost wages, future lost wages, intentional infliction of emotional distress, negligent infliction of emotional distress, incurrence of legal expenses, and court costs premised on allegations that the defendants had made false and malicious statements that injured Holmes and colluded to have Holmes arrested. Lea filed an answer generally denying any liability for the injuries and damages claimed by Holmes.[4]
On February 14, 2017, Lea filed a motion for summary judgment, asserting that Holmes could not prevail on his claims of defamation, negligent or intentional infliction of emotional distress, or otherwise prove entitlement to any of the damages *1009 claimed in his petition. A hearing on Lea's motion for summary judgment was held on March 13, 2017, following which the trial court granted the motion in favor of Lea and dismissed all of Holmes's claims. Holmes appeals that judgment, which was signed by the trial court on April 11, 2017.
SUMMARY JUDGMENT PROCEDURE
After adequate discovery, a motion for summary judgment is properly granted if the motion, memorandum, and supporting documents, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). The mover bears the burden of proving that he is entitled to summary judgment. However, if the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent's claim, action, or defense. La. C.C.P. art. 966(D)(1). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the nonmoving party must produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1).
In ruling on a motion for summary judgment, the trial court's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Bice v. Home Depot U.S.A., Inc., 16-0447, p. 3 (La. App. 1st Cir. 12/22/16), 210 So.3d 315, 318.
DISCUSSION
Holmes assigns as error the trial court's granting of the motion for summary judgment dismissing his claims against Lea. In support of his sole assignment of error, Holmes argues genuine issues of material fact exist as to his claims of defamation,[5] intentional infliction of emotional distress, and negligent infliction of emotional distress, such that summary judgment was improperly rendered. We will separately consider the summary judgment in relation to each of these claims.
Defamation
Defamation is a tort involving the invasion of a person's interest in his or her reputation and good name. Hence, a statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule. Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 4 (La. 7/10/06), 935 So.2d 669, 674. In cases involving private individuals, a claim of defamation requires proof of all of the following: (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) a showing of negligence based on the person either knowing the statement falsely defames another, acting *1010 in reckless disregard of whether the statement falsely defames another, or negligently failing to ascertain whether a statement falsely defames another; and (4) resulting injury. See Kennedy, 05-1418 at pp. 15-16, 935 So.2d at 681.
Words that expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Kennedy, 05-1418 at p. 5, 935 So.2d at 675.
In Louisiana, privilege is a defense to a defamation action. The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability. Kennedy, 05-1418 at p. 16, 935 So.2d at 681. A conditional or qualified privilege arises in a variety of situations in which the interest that an individual is seeking to vindicate or to further is regarded as sufficiently important to justify some latitude for making mistakes so that publication of defamatory statements is deemed to be conditionally or qualifiedly privileged. Kennedy, 05-1418 at pp. 16-17, 935 So.2d at 681.
Whether a conditional privilege exists involves a two-step analysis. Kennedy, 05-1418 at p. 17, 935 So.2d at 682. First, it must be determined as a matter of law whether the circumstances in which a communication was made satisfy the legal requirements for invoking the conditional privilege. The second step requires a determination of whether the privilege was abused, which requires a factual determination that malice or lack of good faith existed. Cook v. American Gateway Bank, 10-0295, p. 13 (La. App. 1st Cir. 9/10/10), 49 So.3d 23, 33.
Louisiana courts have recognized that the public has an interest in possible criminal activity being brought to the attention of the proper authorities and have extended a qualified privilege to remarks made in good faith. Kennedy, 05-1418 at p. 19, 935 So.2d at 683. In this case, Lea's communication was of the possible theft of his dog, and the complaint was made to Garig, a sheriff's deputy and the proper official authorized to protect the public from such an act. Thus, Lea's communication to Garig satisfies the legal requirements for invoking the conditional privilege.
Nevertheless, Holmes contends that Lea's communication was maliciously made without good faith, and thus fails under the second step of the conditional privilege analysis. Holmes points out that Lea knew that his dog was lost and had been missing for several days prior to appearing at Holmes's house. Hence, Holmes argues that Lea had no grounds for reporting the dog stolen. The unrefuted evidence in the record before us, however, discredits this argument.
According to the affidavit Garig submitted for the issuance of the arrest warrant against Holmes, Lea reported the following to Garig: On April 22, 2013, Lea let his dogs out for some exercise, following which his Boerbel Mastiff did not return. Lea said that he searched for the dog for several days, but eventually gave up, fearing that the dog was dead. On May 4, 2013, Lea learned from a friend who had talked to Holmes's neighbor that the dog had shown up at Holmes's residence. Lea contacted the neighbor, who then contacted Holmes. Holmes informed the neighbor that the dog was being housed in Watson while he was away, but Holmes would *1011 contact his girlfriend to retrieve the dog immediately. Lea then waited at the neighbor's home, but he eventually had to leave. Lea left his phone number with the neighbor to give to Holmes. Lea later spoke with the neighbor at least three times between May 4 and May 15, 2013, at which times the neighbor told Lea that he had given Lea's phone number to Holmes and that Lea should expect a phone call from Holmes, but Lea never received said call.
On May 14, 2013, Lea obtained Holmes's cellphone number and sent a text message and left a voicemail message asking Holmes to contact him, but Lea did not hear from Holmes prior to contacting Garig.[6]
In his deposition, Holmes acknowledged being contacted by his neighbor and being informed that Lea was the owner of the dog that had shown up at his residence. Holmes further admitted that his neighbor had provided him with Lea's phone number and acknowledged receiving voicemail messages from Lea, even though he did not recall receiving a text message.
Based on the account given in Garig's arrest warrant affidavit, Lea truthfully reported to Garig that he had lost his dog and that he had been informed that the missing dog had later shown up at Holmes's residence. Lea further reported to Garig that despite being advised that Holmes knew of the dog's whereabouts and that Holmes would contact him, Lea never heard from Holmes, at least not prior to Lea contacting Garig. Finally, Holmes acknowledged that from May 4, 2013 (when he was first advised by his neighbor that Lea was the dog's owner) to May 13, 2013, he did nothing to communicate any further information about the dog to Lea or anyone else.
Holmes's admission that he had information regarding the whereabouts of the dog and his seeming refusal to provide this information to Lea was not only grounds for Lea's report to Garig, it was the good faith basis for his report. Notably, it was only after Lea contacted Garig about his missing dog that Holmes finally disclosed to whom he had given the dog (Williams) and provided her contact information. So while Garig's arrest warrant affidavit notes that he was contacted by Lea "in reference to a theft complaint," the undisputed evidence in the record before us shows a good faith basis for Lea's report to Garig.
Hence, we find no merit in Holmes's contention that Lea had no basis to suspect criminal activity such that his report to Garig should not be deemed privileged. Holmes's unexplained refusal to communicate with Lea about the dog prior to Garig's intervention was acknowledged by Holmes and substantiated by the evidence submitted on the motion. This undisputed circumstance, along with evidence that Holmes knew of the dog's whereabouts, unquestionably supports Lea's act of reporting Holmes's association with his missing dog to Garig. As such, Lea's report to Garig was conditionally privileged, and we reject Holmes's arguments that the summary judgment evidence presents any genuine issues of material fact as to Holmes's claim of defamation.
Emotional Distress Claims
In addition to his claim of defamation, the trial court dismissed Holmes's claims of intentional and negligent infliction of *1012 emotional distress. Holmes's claims of emotional distress are premised on allegations that Lea used his authority as a Louisiana State Trooper to convince Garig that criminal charges should be filed against Holmes. He also claimed the following voicemail message left by Lea was conduct intended to cause him emotional distress:
Hey Kyle, this is Tommy Lea[.] [L]ook[,] I finally got [a hold] of Lori[.] [S]he tells me that my dog got out of the fence[,] and she has no idea where he's at now[.] [Y]ou have until Sunday, Sunday to give me my dog or your ass is going to jail, for felony theft and you can kiss your Exxon job good bye.
Intentional Infliction of Emotional Distress
In order to recover for intentional infliction of emotional distress, a plaintiff must establish: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. Perrone v. Rogers, 17-0509, p. 6 (La. App. 1st Cir. 12/18/17), 234 So.3d 153, 157-58. While the extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests, it still must be shown that the conduct was intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like. White v. Monsanto Company, 585 So.2d 1205, 1209-10 (La. 1991).
Under the first element of a claim of intentional infliction of emotional distress, the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, some safety valve must be left through which irascible tempers may blow off relatively harmless steam. White, 585 So.2d at 1209. Conduct that is merely tortious or illegal does not rise to the level of being extreme and outrageous. Nicholas v. Allstate Insurance Company, 99-2522, pp. 10-11 (La. 8/31/00), 765 So.2d 1017, 1025.
In his deposition, Holmes admitted that he had no knowledge that Lea had lied to Garig, but he believed that because Lea was a state trooper and because Lea and Garig knew each other from previously having worked together, those circumstances are what led to his arrest.
Garig, who first joined the East Feliciana Parish Sheriff's Office in 1999, stated that from 2002 to 2005, he left the sheriff's office to work for the Department of Public Safety Police, which he described as a division of the State Police that patrols the capitol area. As for the circumstances leading to his involvement in this case, Garig stated in his deposition:
I believe it was May 15th, Tommy Lea, Trooper [Lea], called me; and asked-and just said that he believed that someone had his Boerbel Mastiff that had gotten away from his yard; and that they wouldn't give it back; he said that he tried to make phone calls to this guy on numerous occasions; he won't answer; giving him the runaround; ... he said *1013 the neighbor of Kyle Holmes ... had called Mr. Holmes on one occasion; Mr. Holmes admitted to having a Mastiff, but that he had given it away to someone in the Walker area; but that he would call them; or have his girlfriend go pick the dog up, and bring it back to, um, to meet with Trooper Lea.
Garig acknowledged that Lea did not do anything "untoward" to convince him to do something he should not have done. He said he never indicated to Lea that probable cause did not exist for Holmes's arrest nor did Lea try to persuade him to fabricate probable cause to put Holmes in jail. Garig said that he did not get into any trouble for Holmes's arrest and acknowledged that the district attorney had accepted the case for prosecution. Garig stated that he became involved in the case not because Lea wanted to pursue charges, but because Lea simply wanted his property back. As Garig explained, "a lot of times most people will be forthcoming with law enforcement, where they wouldn't be without the intervention of law enforcement."
Lea's statements to Garig-that Holmes's neighbor contacted Holmes while he was on vacation and had given Lea's contact information to Holmes; that Lea had attempted to contact Holmes; and that Lea did not hear from Holmes until after Lea had contacted Garig-were all corroborated by Holmes. We note that although it is recognized throughout the record that Lea is a state trooper, neither the record nor the parties reveal how Holmes was made aware of this fact. Holmes does not mention that Lea communicated this fact to him in any of the communications he received from Lea. Rather, in the voice message of which Holmes complains, Lea simply identifies himself as "Tommy Lea." And while it is equally unclear how Lea knew that Holmes was employed at Exxon, Holmes also admitted that to the best of his knowledge, Lea never contacted anyone at Exxon about his job.
So while we agree that the voicemail message that Lea left for Holmes after speaking with Williams was threatening, it was not, as Holmes represents, without provocation. According to Garig's arrest affidavit, when Holmes provided Garig with Williams's cellphone number, he told Garig that Lea could contact Williams directly about retrieving the dog. In particular, Garig noted that "[a]ccording to Mr. Holmes[,] he had recently spoken to [Williams] and that she would be expecting Mr. Lea's phone call." However, Garig was later informed by Lea that he made several attempts to contact Williams, but she never answered any of the phone calls. Instead, she eventually sent Lea a text message stating that the dog had escaped from her yard, so she could not give the dog back.
Garig immediately contacted Williams after speaking with Lea and asked her if she had informed Holmes that the dog was missing. According to Garig, Williams stated that she had not spoken to Holmes since the day she got the dog. Garig noted that Williams's statement was a contradiction of Holmes's statement, wherein Holmes told Garig that he had talked to Williams on May 15, 2013, that Williams had told him (Holmes) that she had the dog, and that she would be expecting Lea's phone call. It should be noted that Lea's threatening phone message occurred after he learned of the inconsistent statements from Holmes and Williams regarding Williams's possession of the dog.[7]
Considering the foregoing unrefuted evidence, we find nothing in Lea's statements *1014 and actions that rises to the level of extreme and outrageous. As admitted by Holmes, there is no evidence that Lea attempted to use his position as a state police officer, or that Lea attempted to take advantage of any relationship he had with Garig, to harm Holmes. Moreover, while Lea's voicemail message is threatening, mere threats are insufficient to constitute extreme and outrageous conduct. See White, 585 So.2d at 1209.
The actions and statements of Lea under the attendant circumstances were not so outrageous in character or extreme in degree as to be considered beyond all possible bounds of decency or to be regarded as atrocious and utterly intolerable in a civilized community. To the contrary, the record supports a finding that Lea's actions were indeed reasonable and warranted under the circumstances, as it was only after Lea contacted Garig that Holmes revealed Williams as the person to whom he had given the dog. As this court has previously held that a single crude and offensive text message could not support a conclusion that the actor's conduct was extreme and outrageous as a matter of law, we likewise find that Lea's single voicemail message cannot support the conclusion that Lea's conduct was extreme and outrageous as a matter of law in this case. See Perrone, 17-0509 at p. 9, 234 So.3d at 160.
Summary judgment is a proper procedural method to consider a plaintiff's allegation that a defendant is liable for the intentional infliction of emotional distress, especially in light of the additional burden that such a plaintiff has of showing that the conduct was extreme and outrageous. Perrone, 17-0509 at p. 7, 234 So.3d at 158. Considering the foregoing undisputed facts in this case, we find no error in the summary judgment dismissal of Holmes's claim of intentional infliction of emotional distress.
Negligent Infliction of Emotional Distress
A claim for negligent infliction of emotional distress unaccompanied by physical injury is viable under La. C.C. art. 2315. Barrino v. East Baton Rouge Parish School Board, 96-1824, p. 12 (La. App. 1st Cir. 6/20/97), 697 So.2d 27, 33. A determination of liability for tort damages for mental anguish based on La. C.C. art. 2315 requires application of the duty-risk analysis. Barrino, 96-1824 at p. 12, 697 So.2d at 33. For liability to attach under the duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Barrino, 96-1824 at pp. 12-13, 697 So.2d at 33-34.
Moreover, recovery for negligent infliction of emotional distress unaccompanied by physical injury has been limited to cases involving the "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081, 1096 (La. 1990). In other words, the defendant's conduct must be outrageous or such that he knew or should have known his conduct would cause genuine and severe mental distress as judged in light of the effect such conduct would *1015 have on a person of ordinary sensibilities. Covington v. Howard, 49,135, p. 11 (La. App. 2d Cir. 8/13/14), 146 So.3d 933, 940, writ denied, 14-1927 (La. 11/21/14), 160 So.3d 973. As has been previously recognized, Lea's conduct was not outrageous nor could it be viewed as causing Holmes severe mental distress.
Holmes testified that he visited his personal doctor one time for anxiety relative to this incident and that he received a prescription for Lexapro, an anxiety medication, which he stated he was still taking as of the date of his deposition in November 2016. Holmes admitted he had suffered anxiety and depression in the past and had previously taken Lexapro. He also stated that he did not receive any counseling or mental health treatment following the events related to Lea's missing dog. Other than these statements made by Holmes in his deposition, which evidence was offered by Lea in support of his motion for summary judgment, there is no other evidence in the record before us regarding the mental anguish suffered by Holmes.[8] And while this evidence establishes that Holmes suffered some anxiety, stress, and embarrassment, even the most generous and liberal view of Holmes's account of his suffering does not establish that his suffering was severe.
Additionally, under the duty-risk analysis, we recognize that duty is a question of law. Simply put, the inquiry is whether a plaintiff has any law-statutory, jurisprudential, or arising from general principles of fault-to support his claim that a duty was owed. Although the determination of whether to assign a legal duty is fact specific, the issue of whether there is a duty is ultimately a question of law. When no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment. Smith v. Kopynec, 12-1472, p. 6 (La. App. 1st Cir. 6/7/13), 119 So.3d 835, 838.
In this case, while Lea had a duty not to recklessly make a baseless or unfounded report of suspected criminal activity, the record shows that such did not occur. Thus, the record does not establish that Lea breached any general duty owed under the circumstances. And while the record does establish that Lea violated La. R.S. 3:2771, by letting his dog run free so as to eventually wander upon Holmes's doorstep, the harm suffered in this case-that the person who found the dog would be charged with theft of the animal-is clearly beyond the scope of the statute's protection, which is to protect others from being tangibly harmed by unrestrained animals. See Smegal v. Gettys, 10-0648, p. 11 (La. App. 1st Cir. 10/29/10), 48 So.3d 431, 440. So based on these negative answers to the relevant inquiries under the duty-risk analysis, we find that summary judgment was properly granted as to Holmes's claim of negligent infliction of emotional distress.
CONCLUSION
After a thorough de novo review of the record before us, we find no error in the summary judgment granted in this matter. We therefore affirm. All costs of this appeal are cast to the plaintiff, Kyle W. Holmes.
AFFIRMED.
Crain, G. concurs.

Lea's missing dog was a Boerboel Mastiff, reportedly worth around $1,500.00.

The statute providing for "theft of animals," La. R.S. 14:67.2, was repealed by 2014 La. Acts, No. 255, § 3.

The claims against Garig were later voluntarily dismissed without prejudice.

Lea also asserted peremptory exceptions urging the objections of no right and no cause of action and a reconventional demand in that same pleading. Lea later amended his answer to assert several affirmative defenses as well.

In his petition, Holmes also made claims of libel and slander, which he acknowledges are generally claims of defamation, since defamation occurs through either libel or slander. Libel is defamation that is expressed in print, writing, pictures, or signs, while slander is communicated by oral expressions or transitory gestures. Sova v. Cove Homeowner's Association, Inc., 11-2220, pp. 14-15 (La. App. 1st Cir. 9/7/12), 102 So.3d 863, 873.

Holmes testified that he called Lea on Monday, May 13, 2013, but he admitted that he did not leave a message when Lea did not answer. Lea obtained Holmes's cellphone number the following day, Tuesday, and left a message for Holmes that evening and again on the following Wednesday morning. Holmes stated that he did not receive the messages from Lea until Wednesday, following which he called Lea once again and left a voicemail message.

And as Garig's further investigation bore out, Williams did indeed lie about the dog's whereabouts.

Holmes submitted no evidence in opposition to the motion for summary judgment, just a memorandum in opposition.